### In re MAHER et al.

#### (District Court, D. Massachusetts. March 26, 1906.)

#### No. 8,165.

1. BANKRUPTCY—PREFERENCES—RECOVERY.

Where payments were made by bankrupts to their creditor within four months prior to the institution of bankruptcy proceedings, and the creditors had no reasonable cause to believe that it was thereby intended to give a preference, the payments were not voidable by the trustee, nor was the creditor bound to surrender the same as a condition of his right to prove his debt in the bankruptcy proceedings.

[Ed. Note.—For cases in point, see vol. 6, Cent. Dig. Bankruptcy, §§ 255–258.]

2. SAME—PREFERENCES—DISCHARGE—RESISTANCE—GROUNDS.

Bankr. Act July, 1898, c. 541, § 14, subd. 4, 30 Stat. 550 [U. S. Comp. St. 1901, p. 3427], as amended by Act Cong. Feb. 5, 1903, c. 487, 32 Stat. 797 [U. S. Comp. St. Supp. 1905, p. 684], providing that a bankrupt's discharge shall be denied if at any time subsequent to the first day of the four months immediately preceding the filing of the petition he shall have transferred, removed, destroyed, or concealed, etc., any of his property with intent to hinder, delay, or defraud his creditors, does not include a mere preferential payment made to a creditor which did not constitute a transfer of property with intent to defraud other creditors.

3. SAME—FRAUD—EVIDENCE.

Where bankrupts, while insolvent and indebted to a creditor to the amount of several thousand dollars, made several payments of from $100 to $250 each within four months prior to the commencement of bankruptcy proceedings, for the purpose of inducing the creditor to continue to supply material with which to enable the bankrupts to continue their business, and such payments did not reduce the assets available to creditors, but operated to prevent an earlier withdrawal of credit on which the bankrupts were relying, such payments were not fraudulent.

In Bankruptcy. On specifications of objection to discharge.

The following is the report of Referee Olmstead:

These were specifications of objection to the discharge of the debtors, and raised the question whether a preference constitutes a bar to a discharge. The first specification, relating to failure to keep books of account, was expressly waived by the objecting creditor, and reliance was had upon the second and third specifications only. The facts I find to be as follows:

The copartnership of Maher Bros., consisting of Thomas F. Maher and Richard D. Maher, started in business in the year 1902, dealing in North

River flagging and blue stone. They carried on this business continuously from that time down to October 23, 1903. On the latter date bankruptcy proceedings were instituted under a voluntary petition filed by the copartnership and an individual petition by Thomas F. Maher. The evidence showed that from the beginning of their business career they were indebted to two principal creditors, to wit, A. H. Woodward & Co. and the Newark Blue Stone Company, the latter being represented by A. H. Woodward, and that as they continued in business these concerns gave them credit, and the debtors became increasingly in debt to them. In fact, the evidence showed that they were practically the backers of the debtors, and continued to aid them in carrying on the business in the hope that the debtors might obtain in the future some profitable contracts from which they could recover their standing. During four months prior to the filing of the petition the debtors made payments in the ordinary course of business to the creditors A. H. Woodward & Co. and Newark Blue Stone Company, and it also appeared that like payments were made to the objecting creditor, Lemuel E. Demelman, and the debtors contended at the hearing that the creditor was estopped to object to their discharge on this very ground of payment. The effect of these payments to Woodward & Co. and the Newark Blue Stone Company was, in reality, not to reduce the amount of assets available for the creditors, but had the effect of increasing the credit and supplies extended to the debtors. See Kaufman v. Tredway, 195 U. S. 271, 25 Sup. Ct. 33, 49 L. Ed. 190. I find, therefore, as facts, as shown by the testimony, that the debtors, first, did not make any preference, inasmuch as the creditors had no reasonable cause to believe that a preference was intended, even though the debtors may have been insolvent at the time the payments were made. Secondly, I find, as shown by the testimony, that the debtors did not within four months preceding the filing of the petition transfer any property as a payment with intent to hinder, delay, or defraud their creditors.

The creditor's contentions, as stated in his brief, are as follows: First, under the present bankruptcy act (section 14b, subd. 4, Act July 1, 1898, 30 Stat. 550, c. 541 [U. S. Comp. St. 1901; p. 3427], as amended by Act Feb. 5, 1903, c. 487, § 4, 32 Stat. 797 [U. S. Comp. St. Supp. 1905, p. 684]) a fraudulent preference is a bar to a discharge; second, the bankrupts, on the evidence submitted, have committed a fraudulent preference within said section. In other words, the contention of the objecting creditor is that a transfer of property within four months amounting to a preference, under the provisions of section 14b (4), is a bar to a discharge.

It is provided in section 1, subd. 25, "that 'transfer' shall include the sale and every other and different method of disposing of or parting with property, or the possession of property, absolutely or conditionally, as a payment, pledge, mortgage, gift or security." In section 14b, subd. 4, the word "transferred" is used, and as a payment is included in the definition of transfer, and as the debtors made payments in this case the creditor insists that the act of the debtors is brought within the provisions of subdivision 14b, notwithstanding the facts do not warrant, as I have found them, that such payments were made with intent to hinder, delay or defraud their creditors, or even constituted a preference as defined in sections 60a and 60b, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445.]

The objecting creditor's contention is, however, that the word "transfer" is broad enough to include a preference, and the argument in his very able brief is directed to show that such an inference is deducible from the decisions and course of legislation, both in England and this country. Without undertaking to make a comparison of the English statutes or to examine carefully the English decisions, it may be possible to determine whether Congress intended to make a preference a bar to a discharge by an historical and comparative examination of the present so-called "Torrey Bill" and the so-called amendatory "Ray Bill."

Without attempting to examine congressional legislation earlier than Act March 2, 1867, c. 176, it was provided by section 29 of that act (14 Stat. 531; Rev. St. § 5110, cl. 5) that no discharge to a debtor should be granted

"if he has given any fraudulent preference contrary to the provisions of this act, or made any fraudulent payment, gift, transfer, conveyance or assignment of any part of his property." The original Torrey bill (H. R. 3,316) introduced in the Fifty-First Congress on December 20, 1889 (section 54, subd. 5), provided as follows: "Given a preference as herein defined, under an assignment for the benefit of creditors, or otherwise, which has not been surrendered; (8) made a transfer of his property, which any creditor who has proved his debt in the proceedings might, at the time of the bankruptcy, have impeached as fraudulent, if he had then been a judgment creditor, unless such property shall have been surrendered to the trustee." For the history of the Torrey bill, see In re Murphy (D. C.) 3 Am. Bankr. Rep. 499, 501. It is to be observed that the first section of the original Torrey bill also contained substantially the same definition of a transfer as exists in the present act; but it is also to be noted that this act as already quoted contained grounds of objection not contained in the present law as amended. The provision in relation to preference and transfers quoted from the original Torrey bill continued in substantially the same form down to the Fifty-Fifth Congress.

In the spring of 1897 President McKinley called an extra session of Congress, and a bill was introduced in the Senate, sometimes known as the "Lindsay Bill" (Cong. Rec. 1st Sess. April 5, 1897, p. 607, c. 1035, § 51, subd. 2), which contained this provision: "Given a preference as herein defined, after the passage of this act, which has not been surrendered to the trustee; (4) made a transfer of any of his property, which any creditor who has proved his claim in the proceedings, might, at the time of filing the petition, have impeached as fraudulent if he had been a judgment creditor, unless such property shall have been surrendered to the trustee." On December 16, 1897, this same act, known as the "Henderson" or "Torrey" bill, was introduced in the House as a substitute for Senate Bill, 1035, and contained in section 13 the same provisions as already quoted. Cong. Rec. 55th Cong. 2d Sess. Feb. 16, 1898, p. 1780. In this form the bill passed the House and went to a conference, having been substituted for the so-called Senate "Nelson Bill." As the result of a conference, the provisions as to preference and fraudulent transfer were stricken out. See Statement of Conferees, Cong. Rec. 55th Cong. 2d Sess. p. 6428. Thus Congress deliberately rejected any provisions making a preference or fraudulent transfer a bar to a discharge.

The learned counsel for the objecting creditor in his brief alluded to a report of the executive committee of the "National Association of Referees in Bankruptcy," and has sought by the report of this association to show that in the opinion of the referees a transfer was intended by them to include a preference. It may not be out of place, as counsel rely upon this authority, to briefly explain the purpose and objects of this association. In order that the country might have the benefit of uniform procedure, the suggestion of merchants, and that any improvements or defects which had been called to the attention of the referees in the administration of the law might be brought to the notice of Congress, it was deemed proper and advisable that the various referees should organize in an association of this nature, and before the final enactment of the Ray bill, February 5, 1903, four conventions of the referees had been held, to wit, at Chicago, Saratoga, Buffalo, and Milwaukee, at which conventions the subject of perfecting amendments to the law was considered, and a pretty general discussion was had at such conventions on all subjects, except those in relation to compensation of the referees, upon which subject they had voted never to make any suggestions. The propriety of such action is readily understood when it is considered that the Constitutions of several states, among them notably Illinois, and the statutes of others, require the judiciary to make recommendations to the Legislature in relation to the subject of legislation and any needed improvements. This, in America, is the common practice of the executive in all the states. See Article of Referee Eastman, 1 Nat. Bankr. N. 378, July 15, 1899.

On March 21, 1900, the executive committee of this association, of which Referee Hotchkiss, of Buffalo, one of the ablest experts on the subject of

bankruptcy and the editor of the fourth edition of Collier on Bankruptcy, was chairman, issued a report. In this report, on pages 17 and 18, as grounds of objection to a discharge, were recommended the following: "Section 14b (4) made a fraudulent preference which has not been surrendered within ten days after demand by a receiver or trustee," and subdivision 5 "made a fraudulent transfer of any portion of his property to any person"; thus recommending a restoration of the provisions as they had originally appeared in the act of 1867 and in the so-called "Lindsay" and "Torrey" bills, as before quoted. On December 3, 1900, this executive committee met at Elmira, N. Y., at which meeting Congressman Ray, who had succeeded Representative Henderson as the chairman of the judiciary committee of the House, was present. On the following day the committee adjourned its session to New York City, and at its conference there was aided by the advice and assistance of Ex-Judge Addison Brown. At this latter meeting the subject of grounds of objection to a discharge was discussed, and the writer called the attention of the committee to the fact that Congress had in the development and evolution of the Torrey bill rejected a preference as a bar to a discharge, and also to the fact that the Legislature of Massachusetts had also amended its insolvency law by the omission of the preference feature as a bar to a discharge. See Acts 1886, p. 295, c. 322. It was then decided to omit the provision, as it appeared in the Executive Committee's Report on page 18, of a fraudulent preference as a bar to a discharge, leaving a fraudulent transfer as a bar to a discharge. Thus it is evident that the omission of a preference on the part of the referees was a deliberate act, and this report cannot, therefore, be cited as an authority for the proposition as maintained by the counsel for the objecting creditor. On February 13, 1901 (56th Cong. 2d Sess. H. R. 14,187), Congressman Ray introduced in the House the original "Ray Bill," and on the margin of this bill a printed reference was made to the Referees' Report, p. 18, and this bill omitted the provision as to a preference as finally recommended by the referees. No action was taken on this bill at this short session of Congress.

On April 16, 1902 (57th Cong. H. R. 13,679), Chairman Ray introduced a bill containing the same provisions as to a fraudulent transfer. Section 5, subd. 4. This bill passed the House on June 17, 1902. After it had been referred in due course to the Senate judiciary committee, its consideration and improvement was delegated to Senator Nelson, and the clause in section 5, "Made a fraudulent transfer of any portion of his property to any person," was stricken out and redrafted by Senator Nelson and accepted by the Senate in the form as it now appears in the act as finally enacted, and the House, on January 28, 1903, concurred in the Senate amendments. Cong. Rec. 57th Cong. 2d Sess. p. 1427.

It is perfectly apparent that the wording of this provision, "Made a fraudulent transfer of any portion of his property to any person," was to Senator Nelson's mind and to Congress, as judged by its final action, too uncertain, vague, and indefinite, and that Senator Nelson sought to make it apply, as it was intended by the referees that it should apply, and as it has been construed in all prior legislation in the absence of the definition of the word "transfer" to apply, to conveyances made in fraud of creditors, as, for instance, such conveyances as were included under the statute of Elizabeth, where the debtor made fraudulent transfers of his property, either without consideration or with a view to concealing his assets from his creditors. A pretty good instance of such a fraudulent transfer will be found in the case of Blennerhassett v. Sherman, 105 U. S. 117, 121, 26 L. Ed. 1080, and a comparison of the final draft of this provision with the almost identical, or substantially similar, language of subdivision 1 of section 3a of the act (Act July 1, 1898, c. 541, 30 Stat. 546 [U. S. Comp. St. 1901, p. 3422]), would appear to render it almost conclusive that Congress intended to create as a bar to a discharge only such acts as would be comprehended within the actions or acts referred to in said section 3a (1) as grounds of bankruptcy. It is also to be observed that in section 3a. subds. 2, 3, when Congress intended to refer to a preference, it used explicit and unmistakable language.

From the foregoing historical evolution of the Torrey bill and its amend-

ments, it is perfectly clear that Congress intended in the passage of the Torrey bill in the Fifty-Fifth Congress to exclude both preferences and fraudulent transfers as bars to a discharge, and that, when it restored in the Ray bill a fraudulent transfer as an additional bar, it purposely omitted preferences, and took pains by adopting the phraseology of section 3a (1), to so formulate the language that there should be no real ground for contending that the word "transfer" was broad enough to include a preference. This line of argument is fortified by the reasoning so ably expressed by Judge Colt, in Re Marshall Paper Co., 102 Fed. 872, 873, 43 C. C. A. 38: "Where a former act contains an express exception, and the first drafts of a later act relative to the same subject contains the same exception, and this exception is omitted from the act as finally enacted, and other provisions in the act are made to conform with this change, we cannot but conclude that Congress intended to make the change, and the courts should not seek to render it nugatory by a forced construction."

The counsel for the objecting creditor in his brief placed especial reliance upon Pirie v. Chicago Title & Trust Co., 182 U. S. 438, 21 Sup. Ct. 906, 45 L. Ed. 1171. The doctrine of this case has been very materially weakened, if not purposely superceded, by the amendment of February 5, 1903, to sections 57g, 60a, and 60b, Stat. 799, c. 487 [U. S. Comp. St. Supp. 1905, pp. 688, 689], so that this decision would appear to be no longer the governing rule.

No case has been cited since the amendment of 1903 to show that a preference constitutes a bar to a discharge. All the decisions since the amendment are cases of fraud or fraudulent conveyances. In re Gift (D. C.) 130 Fed. 230; In re Dauchy, 130 Fed. 532, 65 C. C. A. 78; In re Miller (D. C.) 135 Fed. 591.

While it is undoubtedly true that some of the general principles and purposes of bankruptcy announced in the brief of the learned counsel for the objecting creditor are true, especially the doctrine that equality is equity, it is to be observed that a preference is after all only a constructive fraud. Randolph v. Scruggs, 190 U. S. 533, 536, 23 Sup. Ct. 710, 47 L. Ed. 1165; Keppel v. Tiffin Savings Bank, 197 U. S. 356, 25 Sup. Ct. 443, 49 L. Ed. 790; In re George and Proctor, 1 Low. 409, 411, Fed Cas. No. 5,325; In re Goodfellow, 1 Low. 510, 513, Fed. Cas. No. 5,536.

It certainly cannot be possible under the present law that a creditor can receive a preference, retain it, afterwards prove his debt, and at the same time successfully resist the very debtor's discharge from whom he received it, on the ground that he had given a creditor a preference. If Congress had intended such a result or rule, it would have definitely and distinctly provided such a ground as a bar to a discharge.

I would accordingly recommend that the discharges be granted to both debtors, and the briefs of learned counsel on the facts and law and the agreement as to the evidence are herewith submitted and made a part of this report.

Walter N. Buffum, for objecting creditor.
Robert W. Light, for bankrupt.

DODGE, District Judge. The referee has reported that the specifications of objection which were relied on before him are not sustained. Those specifications were that within four months before the filing of their petition the bankrupts had transferred property or had made money payments to certain persons with intent to hinder, delay, or defraud their creditors.

The evidence in the case establishes, at most, that within the four months referred to and while insolvent the bankrupts transferred property at various times to one of their creditors with intent to prefer that creditor over their other creditors, such as would make the transfers acts of bankruptcy under section 3a (2), Bankr. Act July 1, 1898,

c. 541, 30 Stat. 546. [U. S. Comp. St. 1901, p. 3422]. The transfers referred to consisted in payments of money on account of existing indebtedness. It is contended that they were transfers with intent to hinder, delay, and defraud the bankrupts' creditors, such as are made a ground for refusal of discharge by section 14b (4), Act Feb. 5, 1903, c. 487, 32 Stat. 797 [U. S. Comp. St. Supp. 1905, p. 684]. I find nothing in the evidence which would in any case warrant a finding that the bankrupts' intent regarding the payments was an intent to hinder, delay, or defraud creditors in any other sense than that it was an intent to prefer the creditor paid.

Assuming that the effect of the payments was to enable the creditor paid to obtain a greater percentage of his debt than other creditors of the same class, they were preferences according to the definition given in section 60a, Act Feb. 5, 1903, c. 487, 32 Stat. 799 [U. S. Comp. St. Supp. 1905, p. 689]. It is apparently not contended, and in any case the evidence does not show, that the creditor had reasonable cause to believe that it was intended to give a preference by the payments. Therefore they were not voidable by the trustee under section 60b, nor were they preferences such as the creditor is required to surrender as a condition of proving his debt by section 57g.

If, therefore, the evidence be regarded as having established an intent on the bankrupts' part to prefer the creditor who received the payments, the question will be whether they are thereby shown to have been made with intent to hinder, delay, or defraud creditors within the meaning of section 14b (4). In other words, as applied to a payment to one creditor by an insolvent, is an intent on his part to prefer that creditor, but fraudulent in no other sense, within the meaning of "intent to hinder, delay, or defraud his creditors," as those words are used in section 14b (4)?

In section 3a (1) and (2), where the purpose is to make preferential transfers by an insolvent and also fraudulent transfers, both of them acts of bankruptcy, the two kinds of transfer are separately mentioned and differently described. In section 57g, where the purpose is to require a creditor who has been the recipient of either a preferential or a fraudulent transfer to surrender what he has received as a condition of the allowance of his claim against the estate, the same thing is done by reference to the different sections which make preferential transfers voidable (section 60b) and fraudulent transfers void or voidable (section 67e). If the purpose of section 14b (4) is to make a preferential transfer equally a ground of objection to a discharge with a fraudulent transfer, it is difficult to understand why the same course was not there followed, or why the use of that language only which is elsewhere used to describe fraudulent transfers only was alone relied on to accomplish the purpose. The indication, therefore, from the language used, that section 14b (4) is not intended to accomplish any such result, but is intended to make only fraudulent transfers in the ordinary sense, not including preferential transfers, grounds for refusing discharge, seems to me to be very strong.

The difference between the two kinds of transfer just referred

to is and always has been a difference perfectly well recognized and understood. It has been repeatedly discussed by the courts, as in Githens v. Shiffler (D. C.) 112 Fed. 505, where it was said, "An intent to prefer is not to be confounded with an intent to defraud nor a preferential transfer with a fraudulent one." It is difficult to believe that they have been thus confounded in the act.

Under Bankruptcy Act March 2, 1867, c. 176, preferential transfers were equally with fraudulent transfers objections to the bankrupts' discharge. Section 29 (14 Stat. 531), which made them so, separately and specifically mentions and describes both kinds. See Rev. St. § 5110, cl. 5, where the language is:

"If the bankrupt has given any fraudulent preference * * * or has made any fraudulent payment, gift, transfer, conveyance or assignment of any part of his property," etc.

See, also, clause 9, of the same section.

The present act, as originally passed and as it stood until 1903, did not admit either preferential or fraudulent transfers as grounds of objection. So clearly and fully has the referee set forth in his report the history of the amendments to section 14, which relate to this subject, in each successive stage of the discussion regarding them prior to their enactment in 1903, that I find no occasion to do more than to refer to his statement, so far as that history is concerned. I agree with the referee in the belief that the intent of Congress thereby disclosed in enacting section 14b (4) was (1) not to make both preferential transfers and fraudulent transfers grounds of objection, as they had been under the act of 1867; (2) to make fraudulent transfers only grounds of objection; (3) not to include preferential transfers in the language finally adopted for the above purposes, and now forming section 14b (4). The conclusions reached by a consideration of previous legislation and of the history of the amendment referred to are thus in accord with the conclusion above reached by examination of its language as it now stands in the bankruptcy act, and the relation which that language bears to other provisions found elsewhere in the act, concerning the two kinds of transfers and the effect to be given to each, respectively.

Transfers with intent to prefer a creditor are often referred to as "fraudulent preferences." While fraud, in one sense, is no doubt involved in all such transfers, it is fraud of a different kind from that involved in transfers "with intent to hinder, delay or defraud creditors" according to the ordinary meaning of those words. In a preferential transfer the fraud is constructive or technical, consisting in the infraction of that rule of equal distribution among all creditors, which it is the policy of the law to enforce when all cannot be fully paid. In a fraudulent transfer the fraud is actual, the bankrupt has secured an advantage for himself out of what in law should belong to his creditors, and not to him. In this familiar distinction there is found, as it seems to me, a further and strong ground for the belief that language commonly employed for the purpose of describing transfers objectionable for fraud of the latter kind and such transfers only is not used in section 14b (4) in that wider sense

necessary to make it include transfers objectionable only for fraud of the former kind. Thus, in construing the act of 1867, Judge Lowell declined to say that the words, "Any fraud whatever contrary to the true intent of this act," in the section which defined the grounds upon which discharge was to be refused, included merely technical frauds created by the section declaring what should be acts of bankruptcy. The words might no doubt, it was said, "include all frauds in fact whether specifically defined in any part of the statute or not, but hardly [to] mere acts of bankruptcy as such." Re Locke, 1 Low. 293, 296, Fed. Cas. No. 8,439.

For the reasons above stated, I agree with the referee that a preference is not made a bar to a discharge by the act. I have thus far assumed that the transfers relied on in this case were in fact preferences made with intent to prefer the creditor who received them. If such an intent is to be found, it must rest mainly upon the presumption which arises from the fact that this particular creditor was paid when the bankrupts knew or ought to have known that they were insolvent and unable to pay all their creditors. The bankrupts were insolvent, and must be held to have known that they were insolvent. I find nothing, however, in the evidence which adds to the force of the presumption referred to, and, on the contrary, much that tends to weaken its force. The continuance of the bankrupts' business depended upon this creditor. He furnished the material they used, and they had been in his debt for material from time to time furnished by him ever since they began business in 1902, paying him from time to time on account as they were able. At the time of the payments in question they had been running behind, their indebtedness to him had been increasing, but they were hoping to obtain some profitable contracts which would enable them to continue their business with ultimate profit, instead of loss. The payments made to the creditor during the last four months before bankruptcy were made, as previous payments had been made, on account, as they were able to obtain money, in order that he might continue to supply them with the material without which they could not continue their business. They were not payments of the whole indebtedness due the creditor or of any considerable part of it. On the contrary, they did not amount to $1,000 in all, whereas the whole indebtedness amounted to several thousands. The payments were in amounts of from $100 to $250 each, at intervals of a month or thereabout. Chargeable as the bankrupts were with knowledge of their insolvent condition, they were not contemplating any stoppage of their business or bankruptcy, but were hoping and doing their best to continue. It was only after the payments had been made that they were compelled to stop, because the creditor referred to then at last declined to go on supplying them with their material. Upon all the evidence, I do not think the bankrupts are shown to have designed any advantage to the creditor who received these payments. I also agree with the referee that the payments are not shown to have reduced the assets available to creditors, but that their effect,

on the contrary, appears to have been to prevent an earlier withdrawal of the credit and source of supply upon which the bankrupts were then relying. I adopt the referee's conclusion that the specifications are not sustained.

Discharge ordered.