## In re COTTON MANUFACTURERS' SALES CO.

(District Court, E. D. Pennsylvania. October 21, 1913.)

No. 3,965.

1. BANKS AND BANKING (§ 116*)—NOTICE TO AGENT—IMPUTATION TO PRINCIPAL.

A bank which made loans to a mercantile company, taking assignments of its accounts receivable as they were created as security, and which appointed the president of the company, who acted for the company in the transaction its own agent, under bond, to collect the accounts and deposit the proceeds, is bound by the knowledge of such agent that the company was insolvent.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 282–287; Dec. Dig. § 116.*]

2. BANKRUPTCY (§ 165*)—PREFERENTIAL TRANSFERS—EQUITABLE ASSIGNMENTS.

By an agreement between a bankrupt, which was a mercantile company, and a bank with which it had not previously done business, made more than four months prior to the bankruptcy, the bankrupt agreed to assign to the bank all of its accounts receivable thereafter created, and the bank agreed to advance to the bankrupt 80 per cent. of the face value of such accounts as it approved. The agreement further provided that it might be terminated by the bank at any time without notice, and by the bankrupt by paying the amount of the advances made, on which the accounts should be reassigned. No advance was made at the time nor until, some weeks later, accounts were actually assigned, when the bank took a collateral note for a large sum and credited the bankrupt in its checking account with 80 per cent. of the amount of the accounts, and the business was continued in the same manner; each assignment being treated as a separate and independent transaction. *Held*, that the agreement did not operate as an équitable assignment of the accounts, but merely provided for a future course of dealing in case specific assignments of accounts were thereafter made, nor did the collateral note, which embodied a similar agreement, operate as such assignment, and neither could avail the bank to validate subsequent transfers of accounts within the four months' period, which would otherwise be preferential.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 259, 260, 266; Dec. Dig. § 165.*]

3. BANKRUPTCY (§ 303*)—PROPERTY TRANSFERRED WITH INTENT TO DEFRAUD CREDITORS.

That a mercantile company, with assets of some $40,000, which within the four months preceding its bankruptcy assigned its current accounts receivable to a bank and obtained advances thereon, which were used in its business, and continued to purchase goods on credit, was insolvent, and that during the time of such transactions the excess of its liabilities over assets increased from about $5,000 to about $15,000, does not show such a discrepancy between assets and liabilities as to warrant a presumption of bad faith, and, in the absence of evidence of actual intent to defraud, the assignments of the accounts to the bank cannot be set aside under Bankr. Act July 1, 1898, c. 541, § 67e, 30 Stat. 564 (U. S. Comp. St. 1901, p. 3449), which makes invalid transfers of property within four months with intent to hinder, delay, or defraud creditors except as to purchasers in good faith, and for a present fair consideration.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. § 303.*]

4. BANKRUPTCY (§ 165*)—TRANSFERS OF PROPERTY—VOIDABLE PREFERENCE.

The bank being without actual knowledge of the bankrupt's insolvency, although chargeable with constructive notice of the fact, was, in so far

as it advanced money on the several accounts when they were assigned, and to the extent of such advances, a pledgee in good faith and for a present fair consideration; but, in so far as they were to be held as security for other indebtedness, the assignments were preferential and voidable by the trustee under Bankr. Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799, and Act June 25, 1910, c. 412, § 11, 36 Stat. 842 (U. S. Comp. St. Supp. 1911, p. 1506).

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 259, 260, 266; Dec. Dig. § 165.*]

5. SALES (§ 13*)—ASSIGNMENT OF ACCOUNT—CONSTRUCTION AND EFFECT.

An assignment of an account for merchandise sold, even if it attempts to do so, cannot operate as a conveyance of the merchandise, since by the sale which produced the account the assignor divested himself of the title thereto.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 23; Dec. Dig. § 13.*]

In the matter of the Cotton Manufacturers' Sales Company, bankrupt. On certificate for review of order of Referee. Modified.

The following are the opinion and order of D. W. Amram, Referee:

This matter comes before me upon the petition of the First Mortgage Guarantee & Trust Company, hereinafter called the "Bank," filed March 6, 1911, the answer of the trustee of the Cotton Manufacturers' Sales Company, hereinafter called the "Bankrupt," filed March 15, 1911, the cross-petition of the trustee filed March 15, 1911, the answer of the bank to said cross-petition filed April 21, 1911, and the agreements made between the said parties filed March 16, 1911, and May 17, 1911.

From the pleadings and testimony taken before me I find the following facts:

The bankrupt corporation was engaged in the business of buying and selling cotton yarns and hosiery on commission. In order to raise money it was accustomed to pledge its book accounts as collateral security, and, at the time when its business relation with the bank began, all of its accounts had been assigned for loans made by the Bank of Commerce. By reason of the fact that the Bank of Commerce had invariably notified debtors of the bankrupt as soon as assignments of book accounts were made to it, the bankrupt deemed it expedient to discontinue its business with the Bank of Commerce and to transfer the same to the bank which had established the practice of never notifying debtors of its assignors. Before entering into business with the bankrupt, the bank obtained what its vice president called "excellent bank references" as to the financial standing of the bankrupt, the exact nature of which does not appear, and also obtained a statement in writing from the bankrupt showing its financial standing as of May 1, 1910, which statement was in the following form:

### "Assets.

| | |
|---|---:|
| Merchandise, cost value in warehouse | $ 9,513 33 |
| "         in transit to warehouse | 2,157 79 |
| Notes or amounts due by partners .....None | |
| Outstanding accounts, not due | 37,007 08 |
| "         "         past due | 7,898 70 |
| Cash in bank and on hand | 2,256 40 |
| Special deposit—certificate deposit | 2,400 00 |
| Office fixtures & furniture | 807 55 |
| Commission due on orders not completed | 1,625 90 |
| | $63,666 75 |

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

"Liabilities.

| | |
|---|---|
| Notes payable for merchandise | $ 2,678 57 |
| Owe for merchandise | 22,663 37 |
| Owe to banks assignment accounts advanced | 23,753 09 |
| Loans advanced by warehouse | 4,428 03 |
| Capital paid in | 10,100 00 |
| Surplus | 43 69 |
| | $63,666 75 |

"Annual sales $250,000 to $300,000 approximately.

"Banking reference—Commercial National Bank, Statesville, N. C.

|  |  |
|---|---|
| First National Bank, | Do |
| Merchants' & Farmers' Bank, | Do |
| Girard National Bank, Philadelphia, Pa. | |
| Fourth Street National Bank, | Do |
| First National Bank, | Do |
| Merchants' National Bank, | Do |
| Corn Exchange National Bank, | Do |

"The above statement is a true statement of our conditions this first day of May, 1910.

"[Signed]    Cotton Manufacturers' Sales Co.,
"John E. Nattress, President.
"[Seal.]                                    W. E. Nattress, Secty-Treas."

This statement was given in August shortly before the agreement made between the bank and the bankrupt on August 26th. The bank made no further investigation into the affairs of the bankrupt either at this time or at any time thereafter during the entire period of its dealings with the bankrupt; nor did the bank examine the books, accounts, papers, or correspondence of the bankrupt. The agreement between the bank and the bankrupt is in the following form:

"This agreement, made and entered into this 26th day of August, 1910, between Cotton Manufacturers' Sales Company, party of the first part, and the First Mortgage Guarantee & Trust Company, a corporation organized under the laws of the state of Pennsylvania, party of the second part:

"Whereas, said party of the first part desires to obtain accommodations and advances in money, from time to time, from said party of the second part, and said party of the second part has agreed upon the terms and conditions hereinafter stated, to make certain accommodations and advances,

"Now witnesseth: That for and in consideration of said premises, and for the sum of one dollar ($1.00) paid by said party of the first part to said party of the second part, receipt whereof is hereby acknowledged, as well as for other good and valuable considerations to it moving, said Cotton Manufacturers' Sales Company hereby assigns and agrees to deliver to the First Mortgage Guarantee & Trust Company all accounts receivable by it (the said party of the first part) obtained for goods and merchandise sold and delivered after this date (except sales for cash in hand and sales of consigned merchandise), and it agrees to make special and specific assignment of each and all of said accounts receivable, and deliver the same to the party of the second part within three (3) days after the shipment of the merchandise represented therein and thereby, said assignment to be made in such form and accompanied by such representations, guaranties and agreements as the party of the second part shall prescribe.

"Furthermore, the first party also agrees to deliver with said invoices bills of lading, railway receipts or other satisfactory evidence of actual shipment of the goods and merchandise represented in the invoices, and when required so to do, furnish satisfactory evidence of the actual receipt of the merchandise by the purchaser, and on demand it agrees to bring and deliver to the party of the second part, all correspondence with the purchaser relative to the sale, delivery of and payment for the merchandise represented in said invoices and accounts receivable.

"It is mutually and expressly agreed that the title and right of possession

of said accounts receivable is to be and remain in said second party, and it shall have the right to collect the same direct from the debtor, and whatever the first party does in connection with the collection of said accounts it agrees to do as the agent and representative of the second party and in trust for said second party, and it expressly agrees to indorse and deliver to said second party immediately upon the receipt thereof, all checks, drafts, notes, moneys, securities and collateral of any and every kind which shall come to said first party in payment or settlement of any account receivable for goods and merchandise sold from and after this date.

"It is mutually agreed that the party of the second part shall have access at all times to the books, papers and correspondence of the party of the first part with every opportunity to keep advised concerning the business of· said first party, the character of its sales, the standing of the parties to whom it sells, and said first party agrees promptly to furnish the second party any information which it may receive concerning the financial standing of any purchaser and suits pending or begun against the same, and notify immediately the party of the second part of any material rejection or return of goods, set-off or counterclaim made by any purchaser or deduction or discount claimed by him against any of said accounts receivable or the merchandise referred to therein.

"The second party reserves the right to place the proceeds of any collection to the account of the first party without allowing credit upon any note or advancement made by it to the said second party, the intention being that as the accounts receivable are paid the second party shall have the right to accept new and substituted accounts receivable and release the proceeds of such accounts, thus enabling the First Mortgage Guarantee & Trust Company to grant a continuous line of credit without being called upon to account by indorsements or otherwise for each and every credit (so long as the uncollected accounts receivable afford approved security for the amount advanced).

"The first party agrees to pay to the second party for its services in investigating the credit and financial standing of the customers of the said second party in keeping the accounts and collecting the accounts receivable whether done directly or through the agency of the first party, an amount equal to one per cent. of the face value of all accounts assigned under this agreement.

"In consideration of the foregoing assignment and other covenants, the First Mortgage Guarantee & Trust Company agrees to extend to the first party a credit, with interest at the rate of six per cent. (6) per annum, equal to eighty per cent. of the face value of all accounts receivable approved by it, the First Mortgage Guarantee & Trust Company, against debtors of the party of the first part, not to exceed the aggregate sum of ............

"It is mutually agreed that in making up the estimates of said aggregate sum of $25,000, neither past-due accounts nor any accounts deemed by said party of the second part as undesirable, shall be considered, although the assignment of all such accounts, whether past-due or otherwise, shall continue in full force and effect until actually paid by the debtor.

"It is mutually agreed that this contract may be canceled by the second party at any time without notice, and by the first party at any time by payment of the amount of all advances, with interest, according to the terms of the notes given in evidence thereof, and thereupon the second party agrees to re-assign all unpaid accounts.

"Signed the day and date first above written.

"Cotton Manufacturers' Sales Co.,
"By John E. Nattress, President,
"W. E. Nattress, Secy. & Treas."

For the purpose of further security, an arrangement was made between the bank and the bankrupt whereby John E. Nattress, president of the bankrupt and its general manager, was appointed by the bank to act as its agent to receive moneys, checks, notes, and drafts from the debtors of the bankrupt and pay the moneys over and indorse the checks, notes, and drafts to the bank; and to secure faithful performance on the part of Mr. Nattress he was required to give a bond to the bank in the sum of $10,000.

In accordance with the terms of the above agreement, a collateral note of

$15,000 was given by the bankrupt to the bank, and assignments of book accounts began to be made on September 7, 1910. When the book accounts were presented to the bank and approved by it, 80 per cent. of the face value of the said accounts was delivered by the bank to the bankrupt by being credited to its checking account, and whenever such assigned accounts were paid in full an additional 20 per cent. thereof was credited to the checking account of the bankrupt and 80 per cent. transferred as a credit to its loan account. Some time after August 26th, a second collateral note of $10,000 was delivered by the bankrupt to the bank, and subsequently on October 21st this note and the prior one of $15,000 were merged in a new note of $25,000; the latter being in the following form:

"$25,000.00.                               Philadelphia, October 21, 1910.

"On demand after date we promise to pay to the order of the First Mortgage Guarantee & Trust Company, with interest, at 6 per cent. per annum, twenty-five thousand dollars, without defalcation, for value received; and have delivered as collateral security, assigned accounts, and do agree, on demand, to deposit with the holders such additional security as they may from time to time require—and, in default thereof, this note shall instantly become due and payable, as though it had actually matured; and upon default of payment at maturity, whether such maturity occurs by expiration of time or default in depositing additional security as above agreed, do hereby authorize and empower the holders hereof, for the purpose of liquidation of this note, and of all interest and costs thereon, to sell, transfer and deliver the whole or any part of such security or any additions thereto, or substitute therefor, without any previous demand, advertisement or notice either at broker's board or public or private sale, at any time or times thereafter; with the right on the part of such holders to become the purchaser and absolute owner thereof, free of all trusts and claims. And it is further agreed, that the securities hereby pledged, together with any that may be pledged hereafter, shall be applicable in like manner to secure the payment of any past or of any future obligations of the undersigned held by the holders of this obligation; and all such securities in their hands shall stand as one general continuing collateral security for the whole of said obligations, so that the deficiency on any one shall be made good from the collaterals for the rest; hereby remaining responsible for any deficiency in payment, and waiving any benefit, exemption or privilege under any law now or hereafter to be in force.

"Payable at ——————————
"Due ——————————

                    "[Signed]    Cotton Manufacturers' Sales Co.,
                              "John E. Nattress, President."

The assignment of the book accounts in accordance with the above agreement and practice was made as follows: The bankrupt delivered to the bank two copies of the invoice of the book account to be assigned, one stamped with a form of assignment to the bank, the other without any mark of assignment on it. The former was retained by the bank; the latter was mailed by the bank to the debtor. The form of the assignment of the invoices was as follows:

"Know all men by these presents, that Cotton Manufacturers' Sales Company, in consideration of one dollar in hand paid, the receipt of which is hereby acknowledged, and other (good and valuable) consideration has sold, assigned, transferred and set over, and by these presents does bargain, sell, assign and set over unto the First Mortgage Guarantee & Trust Company, and its assigns, the claim, account and demand set forth and described in the within invoice and statement of right, title and interest of every nature and kind, including the right of stoppage in transit, of the goods and merchandise covered by and described therein, and all moneys due or to grow due upon the sale or sales therein set forth, together with the sole right to collect the same, and hereby constitutes and appoints said the First Mortgage Guarantee & Trust Company its true and lawful attorney irrevocably for it and in its name and stead, but to its own use and benefit, to sell, assign, transfer, set

over, pledge, compromise or discharge the whole or any part of the aforesaid claim, account and demand, together with all checks and drafts, if any, which may be drawn to the order of Cotton Manufacturers' Sales Company in payment of said account or any part thereof and for that purpose to do all acts and things necessary or proper in the premises and one or more persons to substitute with like power, hereby ratifying and confirming all that its said attorney or its substitute or substitutes shall lawfully do by virtue hereof.

"And the undersigned, and each of them, agree that if any check, draft or money intended as credit upon or payment of the account set forth on the reverse side hereof, shall come to the undersigned or either of them at any time, such checks, drafts and money shall be received by the undersigned as the property of and in trust for the above named assignee and be immediately indorsed and delivered to it, and each of the undersigned jointly and severally hereby guarantees the acceptance of the within stated merchandise by the consignee and the payment in full of the within named stated account.

"This and the previous assignment hereof is made for the purpose of obtaining money by loan from the First Mortgage Guarantee & Trust Company, and for said purpose Cotton Manufacturers' Sales Company each for himself, represents and avers that the following statements are true:

"1. That the within invoice and account represents a bona fide sale, and that all of the merchandise represented therein as sold, was packed and shipped to the customer as shown on said invoice.

"2. That the amount set forth in said invoice and account is wholly unpaid, and that nothing but time is wanted to fix an actual demand against the within named debtor, and that there exists no offset or counterclaim thereto, and that no agreement has been made with said customer under which any reduction or discount may be claimed except as stated therein.

"3. That said account has not been sold, given, transferred or assigned, or in any way or manner pledged to any person, persons or institution whatsoever, except the First Mortgage Guarantee & Trust Company.

"In witness whereof. Cotton Manufacturers' Sales Company has caused this assignment to be executed by its duly authorized officer this 15th day of November, 1910.

"[Signed] Cotton Manufacturers' Sales Company,<br>
"John E. Nattress, President."

The copies of the invoices were accompanied by a printed form containing a list of the accounts assigned from time to time in the following form:

"To the First Mortgage Guarantee & Trust Co., Philadelphia, Pa.

"Referring to our contract with you dated August 26, 1910, we hereby tender for your acceptance additional accounts as per schedule inclosed. Upon your acceptance these accounts will become subject to all the provisions of said contract as if originally scheduled therein:

| Invoice No. | Date Due | Name | Address | Amount | Credit |
|---|---|---|---|---|---|
| | | | | | |

"We do hereby certify and declare that the above amount is a true and correct inventory of the accounts assigned by us this day to the First Mortgage Guarantee & Trust Co., for goods shipped to the above named firms.

"Dated Philadelphia, Pa. this ——— day of ———, 19——.

"Cotton Manufacturers' Sales Company,<br>
"———————, President."

Neither party to this agreement gave notice of any assignment of accounts to the debtors, and it is an admitted fact that the debtors whose accounts with the bankrupt were unpaid at the time of the bankruptcy received no notice of the assignment of their accounts to the bank until after the bankruptcy.

On December 28, 1910, the claim of the bank against the bankrupt had reached its maximum, to wit, $24,941.58, and between that date and the date

of the bankruptcy, to wit, January 24, 1911, the bank received from collections the sum of $12,106.34, thus reducing the amount due on advances to $12,835.24 at the date of the bankruptcy.

On January 6, 1911, the Kingston Cotton Mills, having a claim of $2,500 against the bankrupt which the latter was unable to pay, issued a foreign attachment and served the bank as garnishee. On January 5 and 9, 1911, the following accounts were delivered by the bankrupt to the bank, to wit:

| | |
|---|---:|
| No. 439—Industrial Mills | $ 330 00 |
| 440—Delaware Hosiery Mfg. Co | 310 56 |
| 441—Gem Hammock & Fly Net Co | 1,378 41 |
| 442—Star & Crescent Co | 300 00 |
| 443—Zebulon Hosiery Mills | 117 60 |
| 444—Delaware Hosiery Mills | 419 29 |
| 445—Star & Crescent Mills | 300 00 |
| 446—H. B. Newton | 423 19 |
| 447—   "        " | 263 85 |
| 448—Gem Hammock & Fly Net Co | 1,889 83 |
| 449—Waldensian Hos. Mills | 153 67 |
| Total | $5,886 40 |

These accounts were delivered for the purpose of obtaining the usual advance of 80 per cent., but the bank retained the accounts and refused to make any loan on them on account of the pending attachment. The attachment was never dissolved. On January 17, 1911, the executive committee of the bank instructed the assistant secretary to appropriate to the loan account 100 per cent. of the amount collected thereafter and not to credit any part of the same to the bankrupt's checking account. Pursuant to said direction, the amount collected on the following accounts was so appropriated:

| | | |
|---|---|---:|
| 1/17/11 | Wright Health Underwear Company Bill #419 | $ 154 05 |
| 1/18/11 | Warde Mehan | 238 35 |
| | John Moore & Sons | 116 62 |
| 1/12/11 | Robert Thoburn | 440 90 |
| 1/12/11 | Robert Thoburn | 93 60 |
| 1/23/11 | Gem Hammock & Fly Net Co | 1,359 04 |
| 1/24/11 | John Barrows | 2,941 97 |
| | Bee Knitting Co | 53 94 |
| | Leolastic Co | 302 48 |
| 2/1/11 | Industrial Mills | 418 24 |
| | Lyon Hosiery Mills | 153 81 |
| | Boger & Crawford | 170 50 |
| | Delaware Hosiery Co | 655 04 |
| 2/11/11 | Industrial Mills | 358 50 |
| 2/23/11 | Dickey & McMaster | 233 53 |
| | Sundry Account | 916 00 |

The petition in bankruptcy was filed January 24, 1911, and on the said date the value of the assigned, unpaid bills held by the bank was $21,194.03, and the advances thereon amounted to $12,835.24. Subsequent to the bankruptcy, this balance was changed by certain charges and credits reducing the amount of advances to $11,720.87.

There is no evidence whatever to show that the bank at any time received any accounts from the bankrupt in substitution of accounts overdue or undesirable or paid; nor is there any evidence of a release of any of the accounts or the proceeds of the same to the bankrupt; and I find that there was no substitution of accounts or release of accounts or proceeds as aforesaid.

In February, 1911, goods sold to the Leolastic Company of Bayonne, valued at $273.52, were returned to the bank and resold by it on February 23d for $233.53, and the proceeds of said sale were retained by the bank. During the same month, goods sold to the Lyon Hosiery Mills, valued at $228.25, were returned to the bank and resold by it to the Franklin Hosiery Mills on March

1, 1911, for $215.38, and the proceeds of the said sale were retained by the bank.

· The foregoing finding of acts is based on the testimony taken up to the meeting of December 13, 1911. After the testimony was closed, arguments heard, and briefs submitted, the attorney for the trustee requested me to grant him a further hearing to enable him to present additional testimony. I granted this request and fixed a meeting for April 18, 1912, for this purpose. All of the testimony taken at this and subsequent meetings was taken subject to the general objection of counsel for the bank on the ground "that both sides had closed, argued the case, and submitted their paper books, and for that reason he did not think it proper to reopen it for the taking of additional testimony," and "that this is an attempt to offer testimony which could have been produced before the parties closed their testimony and argued the case." Notwithstanding these objections, I heard the testimony, being of the opinion that under the circumstances of this case there was no good reason why the request should have been refused. The assigned accounts were and are in process of collection by the trustee in bankruptcy under an agreement made between him and the bank, and the delay·in taking the additional testimony could not be prejudicial to either party. I therefore deemed it discretionary with me to allow the matter to be reopened. The admission of testimony after the case is closed is discretionary with the trial court. Lauer v. Yetzer, 3 Pa. Super. Ct. 461. The court may withdraw a juror because plaintiff does not have proper evidence at hand to prove his case. Eichelberger v. Nicholson, 1 Serg. & R. (Pa.) 430. If the court has the right to continue the case for such reason, it would follow that it has the right to admit the evidence out of the regular order of the presentation of the same. As practice before referees is not controlled by the same rigorous rules that prevail in practice before juries, it is a fortiori in the discretion of the referee to admit or reject testimony offered after the hearings before him have closed. The general principles which govern the order of proof and admission or rejection of testimony in trials before juries ought to be, and in fact are, greatly modified where a case is heard before a chancellor or before a master or a referee in bankruptcy. Advantage·of the flexible nature of the proceedings is, by common consent of the bar, constantly taken by counsel in the trial of·cases before a referee to present the case on its merits without any very nice regard to the rules of evidence, and I am unable to find any force in the argument of counsel for the bank whereby he seeks to exclude from my consideration important, relevant testimony for the technical reasons assigned by him. I should say that the discretion of the referee should be exercised in favor of the admission of all relevant testimony even after a matter is closed and argued, provided that he is satisfied that the offer is made in good faith and not for delay or for the purpose of unlawfully or unconscionably harassing the opposite party. See, also, Barnhart v. Pettit, 22 Pa. 135; McCoy v. Niblick, 221 Pa. 123, 70 Atl. 577, 30 L. R. A. (N. S.) 355; Hastings v. Thompson, 47 Pa. Super. Ct. 424.

From the testimony taken on and after April 18, 1912, being principally that of the expert accountant and his reports filed, I find the following facts:

On August 26, 1910, the bankrupt was insolvent and its liabilities exceeded its assets by about $3,608.81. From August 27th to September 30th it is impossible to determine from the books of the bankrupt exactly what its condition was, except that during September the bankrupt lost at least $1,069.44, increasing the excess of its liabilities over assets to at least $4,678.25. On October 21st the excess of its liabilities had increased to at least $7,370.38. During the period following October 22d, the bankrupt contracted the greater part of the liabilities which are now proven against its estate in bankruptcy, to wit, the sum of $20,788.48, which created the greater part of the accounts which were assigned to the bank, to wit, $16,221.84.

The excess of liabilities over assets continued to increase. On November 30, 1910, it was $10,990.59; on December 31, 1910, it was $16,749.50; on January 5, 1911, it was $17,555.48; on January 9, 1911, it was $17,988.28; on January 24, 1911, it was $21,027.49.

I find that this condition of insolvency of the bankrupt on August 26, 1910,

and at all times thereafter up to the date of the bankruptcy, appears by its books of account, which were in the possession and under the control of its president and general manager, John E. Nattress.

I find that John E. Nattress, president and general manager of the bankrupt, as well as agent of the bank, is legally chargeable with knowledge of the insolvency of the bankrupt from and after August 26, 1910.

He is presumed to know, as he ought to have known, the insolvent condition of his own company, since he was virtually the whole company himself and officially its president and general manager. In re Houghton Web Co. (D. C.) 26 Am. Bankr. Rep. 202, 185 Fed. 213. Although there is no testimony to the effect that he did in fact know that his company was insolvent, he cannot be presumed to be ignorant of that which it was not merely his duty to know, but of that of which from the very nature of things he could not have been ignorant. Even if he had positively testified that he believed his company to be solvent, I should have found against him from the evidence of his own records.

I find that the bank is legally chargeable with knowledge of the insolvency of the bankrupt from and after August 26, 1910, for three reasons:

First, because the information obtained by it at the time of the execution of the agreement was such as to put it on notice and require it to make diligent inquiry. Had it done so, it would have ascertained what was then a fact, namely, that the bankrupt was insolvent. The facts which raise the duty of inquiry are clear enough. The bankrupt was taking away its business from the Bank of Commerce because this bank notified the debtors whose accounts had been assigned, and transferred its business to the bank because it did not give such notice. This fact alone is suspicious and suggests an unhealthy condition of the affairs of the bankrupt indicated by its desire to work under cover. Furthermore, the statement in writing and the contemporaneous oral statements of Nattress show that all accounts then owned by the bankrupt had been assigned for loans to the Bank of Commerce. The statement also showed that the bankrupt had merchandise in warehouses amounting to $9,513.33 subject to warehouse claims of $4,428.03, leaving an equity of only $5,085.30, which together with the merchandise in transit, amounting to $2,157.79, made a total of unincumbered merchandise of $7,-243.09, against which the bankrupt owed for merchandise $25,341.94. The statement further shows that of the outstanding accounts which had been assigned to the Bank of Commerce nearly 20 per cent. were past due. Surely such a statement cannot be taken to denote anything but a state of financial ill health bordering on paralysis, and a bank, with its facilities for inquiring and expert knowledge at its command, cannot be heard to say that it considered this statement satisfactory, and, to use the words of its vice president, "the most satisfactory, the most orderly account we ever had in every respect." The vice president said that he had made inquiry concerning the financial condition of the bankrupt and had received excellent bank references concerning it. In view of the statement in writing which was furnished to the bank, all hearsay "references" are, in my opinion, valueless, no matter by whom given, and it was sheer folly for the bank to accept them and act upon them. The statement which was furnished to it pointed toward insolvency, and, indeed, as I have found, insolvency actually existed at the time when the statement was given. It was the fault of the bank that it did not discover this fact, for the evidence was at hand and, indeed, in its very possession. The inquiry made by the bank from the president of the bankrupt corporation was not sufficient.

In the language of the court in the case of McGirr v. Humphreys Grocery Co. (D. C.) 26 Am. Bankr. Rep. 518, 192 Fed. 55, we may use judicial notice of business customs and methods as criteria for valuing facts as imposing the duty of inquiry. When once the duty of inquiry occurred, it was not met, under the circumstances of this case, by merely asking the president of the bankrupt corporation for information, nor by relying upon the so-called bank references in the face of the information disclosed by the statement in writing which was furnished to the bank. The fact that the bankrupt transferred its account from the one bank to the other on account of its fear about its credit should have put the bank on inquiry as to the real financial condition

of the bankrupt. The bank apparently neglected to investigate because it was intent merely on its security and satisfied to take the same for the purpose of doing business with the bankrupt. I cannot reach any other conclusion than that the bank remained purposely ignorant and blind of the circumstances of the bankrupt, and that therefore it must be held to have had reason to believe that the legal effect of taking the assignments was not to give it security but a preference, except in so far as the assignments were made in good faith and for a present consideration. In re Coffey, 19 Am. Bankr. Rep. 148. In Tilt v. Citizens' Trust Co. (D. C.) 27 Am. Bankr. Rep. 320, 191 Fed. 441, the court said: "When a person accepts from its debtor, as the president of this trust company accepted, an assignment of a book account for but a single dollar, as collateral security to the debtor's promissory note, and this after a multitude of like accounts, but of large amounts, had already been transferred as security for the payment of several other notes of the same debtor, who was known to be hard pressed, it must inevitably occur to him that the debtor's assets are practically exhausted. The inquiry, if such it can be called, made in behalf of the trust company, was not, under the circumstances, reasonably careful or sufficient."

The second reason for finding that the bank had knowledge of the bankrupt's insolvency is that the books and records of the bankrupt were, by the agreement of August 26, 1910, placed absolutely under the control of the bank, and a proper examination of them by the bank or by any person duly qualified and acting in its behalf would have disclosed the fact of insolvency. The books of the bankrupt were, of course, evidence on the question of insolvency within four months of the date of the filing of the petition. "They are not conclusive upon this subject, for they may be incomplete, incorrect, or fraudulent, but ordinarily they are important evidence and entitled to much weight." In re Docker-Foster Co. (D. C.) 10 Am. Bankr. Rep. 584, 123 Fed. 190. This is the law as to the value of books in evidence when the insolvency of the bankrupt is to be proven; a fortiori when such insolvency is to be established not in a legal forum but only in the judgment of the person making the inquiry, a prudent bank should require less persuasive evidence of the insolvency of a prospective debtor than would be necessary to convict the debtor in a court of law. If the bank could not have had the books or an expert to examine them, it would not have been chargeable with knowledge of their condition because the intimate, inaccessible information contained in the books cannot bind the creditor; but where the books are in its possession or under its control and open to its inspection, and where they will yield the information to a reasonable inquiry, the bank must be held to have the knowledge which it could thus have acquired. In re Wolf Co. (D. C.) 21 Am. Bankr. Rep. 73, 164 Fed. 449, affirmed in Sharpe v. Allender, 22 Am. Bankr. Rep. 431, 170 Fed. 589, 96 C. C. A. 104. The bank had absolute control of the books, but never opened them or had any one look into them in its behalf.

The third reason for imputing knowledge of the bankrupt's insolvency to the bank is that the president and general manager of the bankrupt was specially appointed as the lawful agent of the bank for certain duties, in the regular performance of which he obtained a knowledge by presumption of law of the insolvency of his corporation by which knowledge his principal, the bank, was bound. See Bankruptcy Act, § 60b; Babbitt v. Kelley, 96 Mo. App. 529, 70 S. W. 384, 9 Am. Bankr. Rep. 335. In re Nassau (D. C.) 15 Am. Bankr. Rep. 793, 140 Fed. 912, is a case interesting both on the point of the liability of the principal for knowledge of its agent and of the duty of inquiry imposed. In this case the agent of the creditor, immediately upon taking certain mortgages as security for past indebtedness and before the mortgages were recorded, was warned by the debtor's counsel that in case of bankruptcy the mortgages would give the creditor no priority. "He asks the debtor whether he intends or expects to go into bankruptcy and is answered, 'No, not so far as I am concerned.' He makes no further inquiries, records the mortgages in such order of priority as will effectuate his client's intention to make one of them an ultimate gift to the debtor, makes no examination of the property, and, when the searches show an assessment of less than one-half the value of the real estate stated to him by the debtor, contents himself by

an inquiry of the debtor as to its correctness. The inference is irresistible that he judged it better to make no further inquiry. Had he made this inquiry, he would, as an experienced man of business, have ascertained the facts rehearsed in this opinion, and must have come to the conclusion that Nassau was insolvent, and that these mortgages constituted a preference over other creditors."

The next question to be determined is the effect of the agreement of August 26, 1910. The purpose of this agreement, according to its terms, was to provide for future loans from the bank to the bankrupt upon assignment by the bankrupt to the bank of future accounts receivable. The security for the loans to be made was not transferred by the agreement of August 26th, but the bankrupt thereby did agree that thereafter it would make a special and specific assignment of each and all accounts receivable and deliver them to the bank. It is true that the words in the agreement are that the bankrupt "hereby assigns and agrees to deliver" to the bank all accounts receivable by it, but, in fact, no accounts receivable were assigned and delivered at the time of the execution of this agreement and not until about two weeks thereafter. No consideration whatever passed from the bank to the bankrupt for the execution of the agreement of August 26th; the bank made no loans, gave no credit, or assumed no liability upon the faith of this agreement. The bank sought by this agreement to obtain absolute control of all of the book accounts of the bankrupt, and it reserved the right to make loans on only such of these accounts as it approved, but sought to hold all accounts assigned, whether approved or not, as security for any advances made by it to the credit of the bankrupt. Upon accounts approved by it the bank agreed to give a credit of a sum equal to 80 per cent. of such accounts.

It is doubtful, even where there is no insolvency at the time of the execution of the agreement (as stated in the case of First National Bank of Pittsburgh v. Guarantee Title & Trust Co., 24 Am. Bankr. Rep. 330, 178 Fed. 187, 101 C. C. A. 507), whether "under the law of the state of Pennsylvania an assignment of all of the assignor's future book accounts, without limit as to time, as security for present and future indebtedness to the assignee, without limit as to amount, may be enforced in equity against the creditors of the assignor, or against the assignor's trustee in bankruptcy." The effect of such an agreement would be to enable the assignee to be the secret owner of all of the intangible assets of his assignor with the right to appropriate them at his pleasure and with concealment from other creditors of the assignor of the real status with reference to their ownership. The rule of law laid down in the case of Clow v. Woods, 5 Serg. & R. (Pa.) 275, 9 Am. Dec. 346, and cases following it, inhibiting the attempt to separate title and possession of tangible property, has not been recognized in cases of intangible property because of the difference in the evidence of possession between these two classes of property. But if the opinion of the mercantile world be considered a fair test of the propriety of such secret assignments of all book accounts and the analogy of Bulk Sales Laws be invoked, it would seem that such agreements should be declared to be illegal, and if, as is argued on behalf of the bank, loans on such agreements are a general custom among financial institutions, I unhesitatingly say this is a bad custom, one contrary to good policy and business ethics, and one that should be suppressed. If a merchant asking for credit should advise his prospective creditor that he had assigned all of his book accounts, it would require some unusual condition or some peculiarly intimate relation between the parties to induce the prospective creditor to grant the credit. In the case at bar one creditor of the bankrupt testified that it was the policy of his firm not to sell merchandise to persons who are engaged in the business of assigning their accounts for advances of money, and that if he had had such knowledge of the practice of the bankrupt he would not have sold it any goods. I believe that this expression of opinion fairly represents the attitude of the business world toward such contracts, and a practice that is thus condemned should be declared unlawful. If this is a sound argument against actual transfers of all book accounts of a business concern, then it applies with equal force to an agreement to transfer all such book accounts. The strong language of the court in the matter of Great Western Manufacturing Co., 18 Am. Bankr. Rep. 259, 152 Fed. 123, 81 C. C. A. 341, points out the

dangers to honest business enterprise of preferential transfers such as were considered in that case and may be applied with equal force to the case at bar.

But, apart from this consideration of the matter, I am of the opinion that the agreement of August 26, 1910, does not have the force and effect which the bank claims for it. It purports to be an assignment in præsenti of accounts to come into existence and be delivered to the assignee in futuro and can only be enforced upon the doctrine of equitable assignment or equitable lien created under it. As to this I shall have more to say hereafter.

The agreement was made at a time when the bankrupt was insolvent and known to be so by the bank. There was no consideration whatever for the agreement of August 26, 1910. Not a dollar of money or credit was given by the bank to the bankrupt under this agreement until the book accounts referred to in it were actually assigned, and the value of the book accounts always largely exceeded the amount of the credit or loan made upon them. The parties, by their practice under this agreement, interpreted it to be merely an agreement defining the terms under which they were to do business thereafter. It set forth in substance the conditions under which the bank would in the future make its advances or give credits to the bankrupt. Had these conditions not been fulfilled, that is to say, had accounts properly approved by the bank never been assigned and delivered to it, and had the other conditions set forth in the agreement not been complied with by the bankrupt, no loans would ever have been made by the bank, and the agreement of August 26th would have been mere waste paper. The argument, therefore, that this agreement of August 26th is to be sustained upon equitable doctrine, falls. An equitable lien is created when the creditor actually gives a credit, pays money, or indorses a note; in other words, gives value and is sought to be secured by accounts to come into existence in the future. The equitable right is based on the fact that the creditor has actually parted with property upon the faith of a promise to secure him.

This was the case in Union Trust Co. v. Bulkeley, 18 Am. Bankr. Rep. 35, 150 Fed. 510, 80 C. C. A. 328, where the creditor became indorser for the bankrupt and was secured by an appropriation of accounts receivable as they accrued by way of pledge or security until the time for the bankruptcy. In that case the court said: "The interest conveyed by an assignment to secure the assignee against liability as an indorser was commensurate in degree and duration with the liability it secured." Hamlin v. European Co., 72 Me. 83. The transaction had all the elements of an equitable assignment of that kind of property as effectually as if it were created by mortgage, although not evidenced by writing (Merchants' Nat. Bank v. Gregg, 107 Mich. 148, 64 N. W. 1052; McDonald v. Daskam, 8 Am. Bankr. Rep. 543, 116 Fed. 276, 53 C. C. A. 554), and meets all the requirements to its validity as an assignment declared in Wright v. Ellison, 1 Wall. 16–22, 17 L. Ed. 555, where it is said "it is indispensable to a lien thus created that there should be a distinct appropriation of the fund by the debtor, and an agreement that the creditor should be paid out of it." It is not material that some of the accounts had not yet accrued. A court of equity would enforce the assignment according to its intent.

"The intention of the parties will be enforced in equity. Fourth St. Bank v. Yardley, 165 U. S. 635, 17 Sup. Ct. 439, 41 L. Ed. 855. It is no objection in a court of equity to the validity of the assignment that manual possession of the accounts was not given. There is no way by which an open account can be physically delivered. Preston Nat. Bank v. Geo. T. Smith Co., 84 Mich. 385–387, 47 N. W. 502; Spring v. So. Carolina Ins. Co., 8 Wheat. 268, 5 L. Ed. 614; McDonald v. Daskam, 8 Am. Bankr. Rep. 543, 116 Fed. 280 [53 C. C. A. 554]. The agreement of the parties transferred to petitioner the equitable title thereto. That effect inheres in the term 'equitable assignment'—an assignment of that much of the debt which a court of equity will recognize and a court of law will not." First Nat. Bank v. Coates (C. C.) 8 Fed. 540–542; Holmes v. Evans, 129 N. Y. 140, 29 N. E. 233; 2 Am. & Eng. Ency. Law (2d Ed.) 1010, title "Assignments."

"The contention that the agreement of January 3, 1903, was purely executory—an agreement to assign the accounts in futuro—not a present executed

transfer thereof even by parol, is negatived by the testimony of both petitioner and the bankrupt. The latter states in terms: 'He (petitioner) asked me what I would give him for security. I told him I would assign those accounts, and before we finished the conversation he asked me if I had assigned those accounts to him, and I said, "Yes."' The petitioner's testimony is equally explicit to the same effect, as has been shown. The facts epitomized are that the bankrupt assured petitioner that, if he would indorse bankrupt's negotiable paper to the amount of $15,000, he would assign his book accounts to secure the indorser's liability, and then and there assigned them to petitioner by parol for that purpose. The petitioner on the faith of that assurance and the contemporaneous assignment of that security indorsed Macauley's paper to the amount of $15,000. The proceeds of these indorsements went into the bankrupt's business, and his creditors have had the benefit of them. It is conceded that the value of the assigned accounts is less than petitioner's liability as indorser.

"It is contended by the appellant that the contract of assignment was a contract to assign, and so was an unperformed agreement when the bankruptcy proceedings were taken, which was converted into a claim for damages for breach of contract merely, by the operation of the Bankruptcy Act. But there is no ground for this contention. If any contract was made, it was one which became of its own force operative as a lien. It is true that the subject to be affected by it was to be thereafter acquired; but when acquired it would become subject to the lien without any new or further agreement. This is something quite different from an executory contract. The same doctrine has been applied to assignments of book accounts to be thereafter earned by the assignor. Tailby v. Official Receiver, L. R. 13 App. Cas. 523."

In the case at bar there is, as has been pointed out, no equity in favor of the bank, for it gave nothing in consideration of the agreement of August 26th, and its status differs herein and in the fact that the agreement was merely executory from the status of the assignee in the Bulkeley Case.

In the case of Godwin v. Bank, 22 Am. Bankr. Rep. 703, 145 N. C. 320, 59 S. E. 154, 47 L. R. A. (N. S.) 935, the bankrupt before the beginning of the four months' period verbally agreed with the bank to transfer certain bonds amounting to $4,500, if the bank would lend the bankrupt $20,000. The bank actually made the loan as agreed upon, and thereafter, within the four months' period, the bankrupt, in performance of his verbal agreement, executed a written assignment of the bonds. The jury found by special verdict that the bankrupt "verbally agreed to transfer" the bonds, and the court said that while this language might be construed as constituting an executory agreement, under the facts of the case, a present equitable assignment more than four months prior to the bankruptcy was thereby created, and the words "agreed to transfer" clearly referred to an agreement to "deliver" the bonds whenever the same came to hand. The court cites with approval from Walker v. Brown, 165 U. S. 655, 17 Sup. Ct. 453, 41 L. Ed. 865, as follows: "Every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees and purchasers, or incumbrancers with notice. By the contract of December, 1903, when these bonds came into his possession and control, E. F. Young had no right to deal with them, except to deliver them to the defendant bank as required by its terms. On the equitable principle which considers that done which the parties are under a binding agreement to do, said Young had no right to make any other disposition of this specific property. This is the principal test by which an equitable assignment may be distinguished from an executory agreement to assign, and a case is presented where the claimant has a right to the specific property against the bankrupt himself, and where, in the absence of some interfering state regulation or of some adverse

provision of the bankruptcy law itself, the defendant's right is enforceable against the trustee. It is this creation of a present interest in the bonds themselves, amounting to an equitable assignment thereof, which differentiates the present case from many of those cited, and relied upon by the plaintiffs' trustees. Some of these were cases where from the very general terms of the agreement no right in any specific property was acquired at all. In others, from the nature of the interest or by reason of some interfering principle of positive law or public policy no right in any specific property was created, except within the period when it was avoided by express provisions of the bankruptcy law itself. Thus in Sheridan's Case (D. C.) 3 Am. Bankr. Rep. 554, 98 Fed. 406, there was an executory agreement to pledge property made prior to the four months, and the property was actually delivered within such period. By the very nature of a pledge no interest passes until delivery, and this was on that ground avoided as a prohibited preference."

In the case at bar the bank gave no consideration for the agreement of August 26th; there was no debt or obligation in existence for which security could or should be given, and there was no security in existence which could then have been transferred for a loan to be made thereafter. Applying the test suggested in the last-cited case, when the bankrupt created the book accounts it had a perfect right to dispose of them except in so far as they were needed to be substituted for accounts already assigned which were found to be insufficient. The bank could not have compelled the bankrupt by decree of specific performance either to create accounts for its benefit or to assign to it accounts coming into existence upon which it had made no advances. The agreement of August 26th therefore was not one creating an equitable assignment, but was merely an executory agreement to assign accounts.

Nor does the agreement fall under the rule laid down in the case of Furth v. Stahl, 205 Pa. 439, 55 Atl. 29, that "a pledge or payment for a consideration given in the present or to be given in the future, whether in money or goods or services, is not a preference." There was no pledge given to the bank for a present consideration or for a consideration to be given in the future; in fact, there was no pledge given at all by the agreement of August 26th; there was merely a promise to give a pledge in the future for a consideration to be given in the future.

I call attention to the case of In re Sayed (D. C.) 26 Am. Bankr. Rep. 444, 185 Fed. 962. In this case money was actually loaned at the time of the assignment of the security, and there was an indefinite agreement to make further loans on the same security, and such further loans were in fact from time to time made; the assignor being solvent during all this time. The court in that case held that all advances made by the bank were made on the strength of the security which it had already received in contemplation of such advances, and that each of these advances was in substantial effect a loan in exchange for present security. Each time by virtue of the transaction the bank contemporaneously received an additional interest in the security. The mere statement of the substance of this case sufficiently distinguishes it from the case at bar without requiring further comment.

I am of the opinion that the agreement of August 26th, for the reasons above stated, was invalid as against the trustee in bankruptcy except in so far as the bank in its subsequent dealings with the bankrupt within the period of four months before the bankruptcy was a purchaser in good faith and for a present, fair consideration. The assignments of accounts which were actually made before the beginning of the four months' period, to wit, the four assignments made between September 7 and September 24, 1910, are not affected by the subsequent bankruptcy, and the right of the assignee to hold the accounts thus assigned must be sustained, not, however, by virtue of the agreement of August 26th, but by reason of the fact that, at the time when these four assignments were respectively made, the period of four months before the bankruptcy had not yet commenced, and, although the bankrupt was insolvent at that time, the clauses of the bankruptcy law relating to preferential transfers can have no application.

Counsel for the bank argues, however, that the agreement of August 26th ought to be sustained; that it and the collateral notes subsequently executed

and the actual assignment of book accounts subsequently made all constituted one transaction; and that they all refer back for their force and effect to the date of this agreement, which having been made more than four months before the bankruptcy, saves all of the subsequent dealings of the parties from the effect of the bankruptcy. Counsel relied especially upon the case of Young v. Upson (C. C.) 115 Fed. 192, 8 Am. Bankr. Rep. 377, and In re Schwab-Kepner Co., decided by Referee Adams of Newark and approved by Judge Cross in the District Court of New Jersey. In Young v. Upson the part of the opinion of the court relied on is as follows: "Since the argument of this case, counsel request that I pass upon the question of a method of application of the collateral. I think that the various sums advanced must be taken as a continuous transaction. The proofs justify that conclusion. The president of the company informed complainant, at the time arrangements for the loan were perfected, that the company needed from $20,000 to $30,000, 'not all at once, but as the business needs required.' For this reason I am of the opinion that the claims paid must first be applied to the payment of the note for which they stand collateral. Any excess may then be generally applied on the indebtedness, including expenses incurred by complainant for collecting accounts after failure of the company."

The facts in the case of Young v. Upson, as they appear in other parts of the opinion of the court, are as follows: "The corporation was adjudicated bankrupt in involuntary proceedings instituted by creditors on January 11. 1900. The undisputed proofs show that in the autumn of 1889 the New York China, Glass & Toy Company (which will hereafter, for convenience, be referred to as the 'company'), being unable to borrow from banks the necessary amount of money to prepare for its fall trade on account of a false report printed in a newspaper as to its financial condition, applied to the complainant, brother of the president of the company, for loans and advances to meet its merchandise account' and current expenses during the fall months. The nature of the company's business was such that the principal portion of its sales was made in the fall and early winter, and payments upon such sales were made in most instances after the holiday season. The stringency of its finances produced by the refusal of the banks to accept its collateral resulted in the board of directors of the company authorizing its president to borrow money of the complainant and to secure repayment by assignments of bills receivable as collateral security. The company was then to collect the assigned accounts as agent for the lender, and without expense to him. Subsequently, at different times between September 16 and December 18, 1899, complainant loaned and advanced to the company various sums, to secure which he exacted and received demand notes for each amount loaned, together with assignments in writing of bills receivable as collateral security. Appended to each note was a list of claims or accounts assigned. The amounts varied from $1,000 to $3,000 and aggregated $53,700. The collateral is estimated to have been 25 per cent. in excess of the loan. It further appears from the evidence that as soon as each account was assigned it was transferred on the ledger of the company to an account designated 'Security Account.' That was done to distinguish such accounts on the company's books from accounts not assigned. As soon as an assigned account was collected, the proceeds were paid to complainant to apply on the loan. Extensions of time of payment and renewals were referred to complainant for his approval or disapproval. The transaction is admitted to be free from actual fraud or deceit. It was not seriously contended on the hearing that a preference was created by the act of transfer. A preference, within the scope of the Bankruptcy Act, is created when it shall be given within four months of filing petition, and when the person receiving it has reasonable cause to believe it was intended to give a preference. We have no such claim here. The security was given for a present consideration, and therefore no fraud on creditors, under the Bankruptcy Act. * * * It does not appear that either the company or the complainant at the time the loans were made had any knowledge of the company's insolvency."

It does not appear from this opinion that the complainant had either possession or control of the books of the bankrupt as in the case at bar, and

therefore was not chargeable with knowledge of what an examination of the books would have disclosed.

It would appear from the facts set forth in the opinion of the court that there was a present consideration actually given for the securities which were subsequently transferred, and that neither the bankrupt nor the creditor had any knowledge of the bankrupt's insolvency. To hold that the decision in Young v. Upson, under the facts as they appear in that case, governs the case at bar, would be to extend the principle of immunity from the charge of preferential transfer far beyond the intent of the bankruptcy law and of the decisions under it. See Tilt v. the Trust Co., supra. In the case of the Schwab-Kepner Co. to which I am referred, there are at least two important differences of fact from the case at bar. The referee in the Schwab-Kepner Case found that at the time of the making of the agreement the bankrupt was not insolvent; that the assignee of the accounts had no reason to believe that the bankrupt was insolvent; and that the loans made to the bankrupt were continually increasing, while the security was decreasing, the result of which was that the dealings between the bankrupt and its assignee resulted in increasing the estate of the bankrupt, hence were for the benefit of the creditors. In the case at bar I have found that the bankrupt was insolvent at the time of the execution of the agreement of August 26th and at all times thereafter; that the bank had legal knowledge of the fact, and that the security was continually increasing by the advance of fresh accounts transferred to the bank, while the loans never equaled the amount of the security, and that the estate was not benefited by the transaction, since its assets were not increased thereby. The referee in the Schwab-Kepner Case says: "All of the assignments of accounts made within the four months' period were made under the agreement of May 16, 1910; the advances were continuous transactions (Young v. Upson [C. C.] 115 Fed. 192, 8 Am. Bankr. Rep. 377), and the agreement operated as an equitable assignment not only of the accounts then in esse, but of those to grow due, which latter passed to the petitioner as they ripened into being by force of the original agreement and not because of a later assignment (Field v. Mayer, 6 N. Y. 179, 57 Am. Dec. 435; Devlin v. Mayor, 63 N. Y. 8, at page 15; Union Trust Co. v. Bulkeley, 150 Fed. 510, 80 C. C. A. 328, 18 Am. Bankr. Rep. 35; Jaquith v. Alden, 189 U. S. 78, 23 Sup. Ct. 649, 47 L. Ed. 717, 9 Am. Bankr. Rep. 776." In so far as the case of Young v. Upson is cited as authority, I refer to what was said hereinbefore with reference to that case. As to the view of the referee that the agreement operated as an equitable assignment not only of the accounts in esse but of those to grow due by virtue of the force of the original agreement, I am of the opinion that the doctrine of equitable assignment has no application in the case at bar for the reasons above mentioned, and for the further reason that one of the essential features of contracts enforceable in equity, to wit, mutuality, is lacking in the contract under consideration, under the terms of which the bank could apparently insist upon having all of the bankrupt's book accounts and the bankrupt could insist on nothing, for the question as to whether he should have a loan depended, not on the contract, but on the good will and pleasure of the bank. He had no enforceable quid pro quo.

It furthermore appears that the conduct of the parties under the agreement of August 26, 1910, shows that it was merely executory in its nature. No money passed directly under it, no loan was made under it until the accounts were actually transferred, the bankrupt asked for no credit on the faith of it without at the same time delivering accounts for assignment. A copy of this agreement was accepted by the bank, was signed by the bankrupt, but unsigned by the bank. This was explained by the vice president of the bank by the fact that it was an oversight in putting it away in the vault. It may as readily be explained by the fact that the bank, having obtained the bankrupt's signature to this agreement which set forth the terms of their subsequent dealings, really did not have to sign it, because the signature of the bank conveyed no rights to the bankrupt which it would not have had even without any agreement. It was, of course, understood by the officers of the bank that no business could be done with the bankrupt unless accounts were produced for assignment and approved. Nobody

paid any attention to the agreement of August 26th which was locked away in the vaults of the bank and not produced until this issue was raised. During the course of the examination, I asked the assistant secretary of the bank, who had special charge of this transaction, the following question:

"Q. I would like to ask you a question in reference to the printed matter on the back of these slips. There is a clause here, Mr. Oglesby, that begins, 'This and the previous assignment hereof is made,' etc. Was there any previous assignment made of this account? A. No."

Counsel for the bank subsequently recalled Mr. Oglesby for the purpose of having him withdraw this answer, and asked him the following question: "Q. Mr. Oglesby, the referee in this case asked you a question which is set forth on page 66 of the testimony, in which he asked you the following question: 'I would like to ask you a question in reference to the printed matter on the back of these slips. There is a clause here, Mr. Oglesby, that begins, "This and the previous assignment hereof is made," etc. Was there any previous assignment made of this account?' And your answer was, 'No.' The paper which the referee referred to, Mr. Oglesby, was the agreement of August 26, 1910. Were you familiar with that paper at all? A. Never saw it.

"Q. So you don't know whether there was another assignment or not? A. No.

"Q. So, therefore, when you made that answer, you testified as to what you knew of? A. As to what I knew and seen.

"Q. But you don't know anything about the other assignment? A. No."

It seems therefore that very little weight was placed on the agreement of August 26th, since the assistant secretary of the bank who had special charge of these loans knew nothing about it.

The purpose of the agreement of August 26th might have been to attempt to do the very thing which the bank is now attempting to do, namely, to protect subsequent transactions from the effect of the bankruptcy law. I do not say that this was the deliberate intention of the bank in this case, but it can readily be seen how such agreements might be used by unscrupulous prospective bankrupts and their no more scrupulous friends to defeat the bankruptcy law, and in this connection a portion of the opinion of the court in Re Great Western Mfg. Co., 18 Am. Bankr. Rep. 259, 152 Fed. 123, 81 C. C. A. 341, is not without importance: "An agreement to mortgage or transfer is not a mortgage or transfer. The title remains in the owner unincumbered by the mortgage until the mortgage or transfer is effected. When the agreement is made before, and the mortgage or transfer within, the four months, the title stands unincumbered by the latter at the commencement of the four months, and the proceeds of that title are pledged under the bankruptcy law for the benefit of all the creditors pro rata. Any subsequent mortgage or transfer withdraws that title or a portion of its value from these creditors, and a just and fair interpretation and execution of the act demands that such a mortgage or transfer should be adjudged voidable if it is otherwise so, and that the mortgagee or transferee should be remitted to his original agreement. In this way the property at the commencement of the four months and its value may be preserved for the general creditors, and the mortgagee or transferee may retain every lawful advantage his earlier contract confers upon him. Any other course of decision opens a new and enticing way to secure preferences, nullifies every provision of the law to prevent them, and invites fraud and perjury. Hold that transfers within four months in performance of agreements to make them before that time do not constitute voidable preferences, and honest debtors would agree with their favored creditors before the four months that they would subsequently secure them by mortgages or transfers of their property, and just before the petitions in bankruptcy were filed they would perform their agreements. Dishonest men who made no such contracts might falsely testify that they had done so, and thus by fraud and perjury sustain preferential transfers and mortgages made within the four months to relatives or friends. The great body of the creditors would be left without share in the property of their debtor and without remedy, and a law conceived and enacted to secure a

fair and equal distribution of the property of debtors among their creditors would fail to accomplish one of its chief objects. This court will hesitate long before it approves a rule so fatal to the most salutary provisions of the bankruptcy law."

Counsel for the bank has referred me to some Pennsylvania cases in support of his contention. An examination shows them to be not in point. Kuhn's Appeal, 163 Pa. 438, 30 Atl. 215, simply decides the question of competency of witnesses to prove that the assignment was made in good faith and for adequate consideration. East Lewisberg Lumber & Mfg. Co. v. Marsh, 91 Pa. 96, decides that the assignment of future collections from sales of reapers to be paid over within three months as collateral security was a valid assignment on the ground that the antecedent indebtedness was sufficient consideration for it and that the assignee for the benefit of creditors had no standing to contest it. In the case at bar, however, the assignment is indefinite both as to amount and as to time; it is not contested by an assignee for the benefit of creditors, but by a trustee in bankruptcy whose rights are different and higher, and the basis of the decision validating the assignment on the ground that the antecedent indebtedness was sufficient consideration is cut away by the clause of the bankruptcy act in relation to preferences. Ruple v. Bindley, 91 Pa. 296, was a contest between the original parties to the transaction, the assignor, the assignee, and the debtor, with no intervening creditors whose rights had attached. Collins' Appeal, 107 Pa. 590, 52 Am. Rep. 479, was likewise a case in which there were no attaching or execution creditors interested.

The next question to be considered is the effect of the execution of the collateral notes. No loan was made under these notes except for the amount of collateral approved by the bank. The note of October 21, 1910, contains a clause which provides that the assignor shall on demand of the bank deposit such additional security as may be required from time to time, and that the security pledged and thereafter paid shall be applicable to secure the payment of any past or future indebtedness of the bankrupt to the bank. I am of the opinion that the execution and delivery of these collateral notes, of which the note of October 21, 1910, is a specimen, add nothing to the rights of the bank, and the arguments applicable to consideration of the agreement of August 26, 1910, have equal force in consideration of these collateral notes. The notes created a valid obligation as against the creditors in bankruptcy only for such sums as were actually advanced by the bank in good faith and for a present consideration upon the securities which were, assigned to the bank. The notes cannot help the bank to apply collateral received by it for any pre-existing indebtedness.

I come now to the effect of the individual assignments of the accounts of the bankrupt to the bank. I am of the opinion from what has been said that the assignments, if valid at all, are valid only for loans actually made on them respectively. Each loan or advance or credit to the checking account of the bankrupt made by the bank is secured only by the account actually transferred to the bank at that time, for, at the time when these loans were made and assignments taken, the bankrupt was insolvent and was known to be insolvent by the bank, and the transactions took place within four months of the bankruptcy.

But the bank contends that, in addition to being security for amounts advanced at the time when they were assigned, the assigned accounts were also security as substituted accounts for accounts collected by the bankrupt and not accounted for, it being the purpose of the parties thereby to keep the security good; but I find no evidence whatever that accounts were collected by the bankrupt and not paid over, nor is there anything in the testimony to indicate that any accounts were ever released by the bank and other new accounts substituted as security in place of those released. To continually take new accounts, keeping both the new and the old, can be said to be a substitution of the new for the old only by a change in the definition of the word "substitution," which has not yet been recognized by lexicographers. In this case there was no substitution of one security for another at any time. What is meant in law by substitution, and when ac-

counts may be properly substituted within four months' period, is set forth in the case of Reese-Hammond Fire Brick Co., 25 Am. Bankr. Rep. 323, 181 Fed. 641, 104 C. C. A. 371. In this case the date of the bankruptcy was July 22, 1907. A note was given more than four months before the bankruptcy proceedings were commenced, accounts were assigned under it, and other accounts assigned later on within the four months' period. I quote from the opinion of the court: "While some of the elements of unlawful preference may be found, yet all are not present, especially knowledge on the part of the bank of the bankrupt's insolvency, of which no evidence was produced (it is not to be inferred from the knowledge of Garland, because a director is not an organ of communication with the bank. Custer v. Tompkins County Bank, 9 Pa. 27; Bank of Whitehead, 10 Watts [Pa.] 397, 36 Am. Dec. 186)." The court found that the accounts assigned took the places of accounts paid, and that these transactions did not impair the rights of the general creditors, for the reason that the substitutions of new for old securities did not in any wise diminish the debtor's estate available for those creditors. "It is too well settled to require discussion that an exchange of securities within the four months is not a fraudulent preference within the meaning of the bankruptcy law, even when the creditor and the debtor know that the latter is insolvent, if the security given up is a valid one when the exchange is made, and if it be undoubtedly of equal value with the security substituted for it."

The assignment of the book accounts of January 5th by the bankrupt to the bank was received by the bank the day before the foreign attachment was served on it as garnishee, and the assignment of accounts of January 9, 1911, was received by the bank after the attachment was served. No loans were made to the bankrupt on these assignments for the alleged reason that the foreign attachment prevented it. These book accounts were not refused by the bank, but were taken and held by it and attempted to be appropriated to its account with the bankrupt. It is neither alleged nor proved that these accounts were tendered or received in substitution for other accounts, and I find that they were tendered and received for the purpose of securing an 80 per cent. loan to the bankrupt. The loan was not made, and I am of the opinion that the bank had no title to the accounts and has no title to the proceeds of their collection. In re Mandel (D. C.) 10 Am. Bankr. Rep. 774, 127 Fed. 863.

The greater part of the assignment of the book accounts was made between September 25 and December 30, 1911; that is to say, within four months of the bankruptcy. Before considering these assignments, I shall consider the effect of the return of merchandise by some of the customers of the bankrupt, which merchandise was received by the bank after the bankruptcy, sold by it, and its proceeds appropriated. I have found that in February, 1911, after the bankruptcy, the bank received merchandise from two debtors of the bankrupt, the book accounts for which had been assigned to the bank. This merchandise was received by the bank and sold for a total of $448.91, which sum was retained by the bank. The question arises: By what title does the bank retain this money against the trustee in bankruptcy?

The only argument offered for the bank's claim of title to these goods is a reference to the phraseology of the form of assignment wherein the bankrupt assigns to the bank "the claim, account and demand set forth and described in the within invoice and statement of right, title and interest of every nature and kind, including the right of stoppage in transit, of the goods and merchandise covered by and described therein," etc. Every other word in the somewhat lengthy form of assignment which is set forth in full on page 633 of this opinion indicates without the least ambiguity the intention of the parties to make an assignment of the book account only, and in no way refers either expressly or by any implication to the merchandise which is the basis of the account assigned. Is the above-quoted phrase sufficiently explicit to make clear the intention of the parties, taking their agreement as a whole, to assign the goods as well as the book account? And if it is clear, is it an agreement valid and enforceable against creditors?

The intention to assign the merchandise, if it existed, is not at all clearly

expressed and by no means necessarily implied. This part of the agreement seems to have been pieced together from different forms, and, reduced to its simplest form, it attempts to assign to the bank the account described in the invoice and the right of "stoppage in transit of the merchandise covered thereby." The assignment is specifically only of the account and the right of stoppage in transit, and the latter does not necessarily mean an assignment of title to the goods, especially when the rest of the agreement, by omission of any reference to the goods where they should be mentioned, negatives the implication. But assuming that it is intended to convey title to the goods, the attempt is futile. I have recently considered this question in Re Shulman, in Bankruptcy, No. 4,129. In my opinion filed and now pending on review before the District Court, I commented on the clause in the Shulman agreement, which attempted to assign "the claims or accounts set forth * * * and the goods covered by or described therein." The form in the Shulman Case does by express words what the form in the case at bar is alleged by counsel for the bank to do by implication. I quote from my opinion in the Shulman Case: "At the date of the agreement the merchandise had already been sold and delivered by · Shulman to Josephson (the debtor whose account had been assigned to the bank) and could not have been transferred by Shulman to the bank. This agreement attempts to convey a chose in action as well as the goods, no longer belonging to the assignor, out of which the chose in action arises. This is obviously impossible. Guarantee, etc., Co. v. First Nat. Bank, 26 Am. Bankr. Rep. 85, 185 Fed. 373, 107 C. C. A. 429. Had the agreement conveyed the goods as security to the bank prior to the sale to Josephson with the proviso that the sale and delivery to him were made for the benefit and behoof of the assignee bank (Caulfield v. Van Brunt, 173 Pa. 428, 34 Atl. 230), the contradiction in the terms of the agreement would have been avoided and a lien on the goods would have been created. Or, the difficulty might have been avoided by following the suggestion of Judge Gray in Guarantee Title Co. v. Bank, 26 Am. Bankr. Rep. 85, 185 Fed. 373, 107 C. C. A. 429, and providing that in case of rejection by Josephson the goods should be delivered to the bank." In the case at bar the goods were actually sold and delivered to two different firms and then rejected and returned by them. The clause last above quoted providing for such rejection might have covered the question now raised, but there is no such clause in the agreement, and the attempt to convey a right to stoppage in transit cannot without more be converted into the larger right here contended for. When the bankrupt was adjudicated, the goods in question were in the possession of the vendees, and, when rejected and returned by them, they were returned as the goods of the bankrupt and not as the goods of the bank.

Reverting now to the assignments made between September 25 and December 31, 1911, they are good in form and apparently incontestable for the amount of money actually advanced on them at the time when they were made, even though they were intended to secure antecedent and subsequent as well as present loans. In re Wolf (D. C.) 3 Am. Bankr. Rep. 555, 98 Fed. 84. As to the inability of the bank to hold them as security for existing debts, enough has already been said. Can they be held as security for subsequent advances? Section 60c of the act provides that "if a creditor has been preferred, and afterwards in good faith gives the debtor further credit without security of any kind for property which becomes a part of the debtor's estates, the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy may be set off against the amount which would otherwise be recoverable from him." In this case the bank made no loans without contemporaneous transfer of security. It never gave "further credit without security" on the faith of some security previously transferred, and therefore cannot be permitted to enjoy the right which this section of the act confers.

The trustee contends that none of the assignments made by the bankrupt to the bank are valid in Pennsylvania by reason of the fact that the debtors of the bankrupt received no notice of the assignment until after the bankruptcy. I am unable to agree with the trustee in this contention, since this

point has been decided adversely thereto by the Supreme Court of Pennsylvania. In Re Phillip's Estate No. 3, 205 Pa. 515, 55 Atl. 213, 66 L. R. A. 760, 97 Am. St. Rep. 746, it was held that notice of the assignment was necessary to uphold it against a subsequent assignee, and in Phillip's Estate No. 4, 205 Pa. 525, 55 Atl. 216, 97 Am. St. Rep. 750, it was held that no notice of the assignment is necessary to uphold it against a subsequent attaching creditor. Under section 47a (2) of the Bankruptcy Law as amended, the status of the trustee in bankruptcy is not that of a purchaser or a subsequent assignee of the bankrupt for value without notice; his status is that of a lien creditor or an execution creditor and, therefore, as against him notice of the assignment to the debtor is not necessary to perfect the title of the assignee. See, also, Young v. Upson, supra.

While I am bound to accept this distinction made by the Supreme Court of Pennsylvania as law, it is too technical to become a permanent principle of jurisprudence. Business transactions are more and more searchingly scrutinized in modern times, and public opinion which favors publicity will ultimately make it impossible for secret liens such as this to be successfully sustained upon mere technical grounds.

We come now to the final argument, namely, that all of the assignments fall by reason of the fact that the bankrupt was guilty of a fraud on creditors, that the bank had knowledge of the fraud, and that in taking the assignments it sought to profit by the fraud, and therefore is not a purchaser in good faith under section 67e. The basis of this contention is fraud practiced by the bankrupt on its creditors. There is no positive direct evidence of fraud, and the trustee's contention rests upon the theory that the bankrupt, by failing to disclose its hopeless insolvency and by continuing to obtain merchandise on credit at a time when it could not have had any intention to pay for the same or any hope in its ability to do so, was guilty of such a fraud. Gillespie v. Piles Co., 178 Fed. 886, 102 C. C. A. 150. It is argued on the other hand, that the facts are consistent with the theory of the innocence of the bankrupt's president; that there is nothing to indicate that, assuming full knowledge on his part of a condition of hopeless insolvency, he did more than is done so often, namely, hope against hope until brought to an absolute standstill; and that he did not in any way, so far as the testimony shows, profit by his transactions with his creditors after the condition of hopeless insolvency had set in.

It is not essential, however, that the bankrupt should have "secured an advantage for himself out of what in law should belong to his creditors and not to him," in order to charge him with such fraud on creditors. Ordinarily it is true that fraud arises out of the attempt of the bankrupt to misappropriate assets belonging to his creditors, but the gravamen of the fraud is not the advantage accruing to the bankrupt, but the loss occasioned to the creditors; the fraud is conclusively presumed to have been perpetrated on them when the bankrupt is hopelessly insolvent and knows at the time when he obtains the new credits that it will be impossible for him to liquidate them. Whether he actually intended to defraud under such circumstances is irrelevant, for the law conclusively presumes such intention. Gillespie v. Piles Co., 178 Fed. 886, 102 C. C. A. 120.

The trustee now argues that, assuming the fraud of the bankrupt, the bank must be presumed to have had knowledge of it, and hence should be prevented from holding the assigned accounts which were intended to secure its advances. Knowledge of the bankrupt's hopeless insolvency at the time of making the loans rebuts the presumption of good faith necessary to support its right to hold the assignments made to it.

But I would go further than the trustee and hold that the bank cannot enjoy the assigned accounts as against other creditors of the bankrupt by reason of the fact that it is directly responsible for the creation of the liabilities due to the other creditors, and therefore in the same position legally as though it had induced these creditors to give the credit upon the faith of statements made by it directly to them.

In the case of Boyd's Ex'rs v. Browne, 6 Pa. 310, it appeared from the evidence that Boyd was the owner of a store, and that he induced Miller to pur-

chase the same through promises of long credit and assistance in selling off the old stock and replenishing the same from time to time. At the time of the purchase Miller was not considered a man of any property. Boyd gave Miller ten years to pay for the old stock purchased from him, promised to keep him afloat and to show him how to pay for it. Among other things that Boyd did in the matter was to take Miller to Philadelphia to business houses of whom Boyd had bought goods and recommend Miller to these merchants as a man worthy of credit and able to pay. There did not seem to be any evidence in the case of Miller's intention to defraud. In the opinion of the Supreme Court, Judge Bell says: "The ground of action is the deceit practiced upon the injured party; and this may be either by the positive statement of a falsehood, or the suppression of material facts, which the inquiring party is entitled to know. The question always is: Did the defendant knowingly falsify, or willfully suppress the truth, with a view of giving a third party a credit to which he was not entitled? It is not necessary there should be collusion between the party falsely recommending and him who is recommended; nor is it essential, in support of the action, that either of them intended to cheat and defraud the trusting party at the time. It is enough, if such has been the effect of the falsehood relied on. Misrepresentations of this character are frequently made from inconsiderate good nature, prompting a desire to benefit a third person, and without a view of advancing the party's own interests. But the motives by which he was actuated do not enter into the inquiry. If he makes representations productive of loss to another, knowing such representations to be false, he is responsible as for a fraudulent deceit. In Foster v. Charles, 6 Bing. 369, when it was first in Westminster Hall, Tindal, C. J., said, 'It has been argued that it is not sufficient to show that a representation on which a plaintiff has acted was false within the knowledge of the defendant, and that damage has ensued to the plaintiff; but that the plaintiff must also show the motive which actuated the defendant. I am not aware of any authority for such a position; nor can it be material what the motive was. The law will infer a proper motive, if what the defendant says is false within his own knowledge, and is the occasion of damage to the plaintiff.' All the other judges fully concurred in the soundness of those views, and indeed they recommend themselves by their intrinsic merit. But that part of the instruction chiefly complained of here is the direction to the jury that the suppression of the fact, by Boyd, that he had taken securities for large amounts from Miller in payment of the merchandise sold by Boyd to him, was evidence of fraud and deceit. The soundness of this opinion is fully shown by the authorities. Neither the intention entertained by Miller, when purchasing goods, nor his belief as to the value of his property, was of any consequence. We have seen that an intention eventually to defraud is not necessary to the action; and, as to the value of the property, the inquiry touched Boyd's belief, and not Miller's." See, also, Huber v. Wilson, 23 Pa. 178; Rheem v. Wheel Co., 33 Pa. 358.

It seems to me that the principles underlying the decision in the case of Boyd v. Browne are applicable to the case at bar. The bank knew that the bankrupt was hopelessly insolvent and unable to pay its debts. It, nevertheless, continued to help the bankrupt create new debts which were to be assigned to it, as collateral security for advances to the bankrupt by means of which the bankrupt was to be further enabled to create more new book accounts, which it would be unable to pay, for the purpose of further assigning them to the bank for further advances. It was a continuous chain of fraud on creditors. The bank was the only one who profited by these transactions; it made its loans, receiving 6 per cent. interest thereon together with an additional 1 per cent. of the face value of all accounts for services in investigating the credit and financial standing of the customers of the bankrupt and in keeping and collecting the accounts. The bank virtually seized the book accounts of the bankrupt as security for its debt, giving further credit on the faith of these books accounts as long as assignments of them continued, knowing all the while that it thereby enabled the bankrupt to create new book accounts and either innocently or intentionally deceive oth-

IN RE COTTON MANUFACTURERS' SALES CO.

er creditors as to its actual financial condition, and believing that through taking the accounts as security it was fully protecting itself against all possible harm. For the sake of obtaining and enjoying its profits, the bank enabled the bankrupt to draw other creditors into business relations by which they inevitably suffered losses. Had the game not been stopped by the issuance of the foreign attachment by one of the bankrupt's creditors, it might have continued for some time more. The limit that the bank had fixed for its loan to the bankrupt was $25,000, and this limit had practically been reached at·that time. It is impossible to tell whether the bank would have extended additional credits. But if we are to assume with the bank that the agreement of August 26, 1910, was the basis of all its future transactions with the bankrupt, we find nothing in that agreement to indicate that it might not have continued to loan money to the bankrupt ad libitum, for the amount of the aggregate of the loans which were to be made by the bank to the bankrupt was left blank in that agreement. This may have been accidental or intentional; as to this I express no opinion. Even after the foreign attachment was levied, the bank advised the bankrupt that it would continue to make advances on assigned accounts as soon as the attachment was dissolved. Applying the principles of the case of Boyd v. Browne, if the bank, at the time when the bankrupt became hopelessly insolvent, had, in spite of its knowledge of the fact, advised the bankrupt's creditors that it was able to pay its bills, there can be no doubt that the bank would have been guilty of actionable fraud. It seems to me that by continuing to grant loans to the bankrupt under the circumstances of this case, upon the security of bankrupt's property, it was placing itself in a position similar to that which it would have·occupied if it had made deliberate misstatements to the bankrupt's other creditors.

It has been argued by the trustee that whatever may have been the hopefulness of the bankrupt corporation as to its ability to extricate itself from its financial difficulties in the period intervening between August 26, 1910, and November 1, 1910, there can be no doubt that on the latter date it, acting through its president, must have realized its hopeless insolvency. I agree with this conclusion of the trustee and find as a fact.that on November 1, 1910, the bankrupt was hopelessly insolvent, and that it is legally presumed to have known this fact, and that the bank was likewise legally presumed to have known it for the reasons hereinbefore stated. If therefore the bank had refused to continue its advances on November 1, 1910, the creditors who did business with the bankrupt from and after that date, and who are the majority of the creditors having claims against the bankrupt estate, would not have done any business with· the bankrupt and incurred any losses on that account. Did the bank have any duty toward the other creditors of the bankrupt which it neglected to perform? It must be remembered that the bank is now seeking enjoyment of bankrupt's property to the disadvantage of other creditors, and that therefore the element of good faith in its transactions which enabled it to secure such property must be made manifest. If it fails in any duty toward the other creditors by reason of which they were induced to give the credit which in turn enabled it to secure assigned accounts, the transaction lacks the essential element of good faith. It may be asked: How can the bank, in the absence of proof of any direct relation between it and the other creditors of the bankrupt, have any duty toward them? There is no evidence of the fact that it ever met any of the other creditors, or that any of them ever made any inquiry of it concerning the standing of the bankrupt. Nevertheless it seems to me that its position is analogous to that of Boyd in the case above cited. Knowing the bankrupt to be hopelessly insolvent, knowing that the money which it was advancing was being used to induce further credits to be given, it was virtually holding out to the public a general recommendation of the bankrupt's ability to pay its debts and the fact that the bankrupt was in funds and able to pay some of its old creditors on account, and thus enabled to obtain new credits, was directly .due to the bank and tantamount to a statement on its part to the bankrupt's creditors that the bankrupt was solvent and able to pay its debts, for it gave a concern that was hopelessly insolvent the means of deceiving its creditors into a be-

lief that it was solvent. There is considerable analogy between the status of the bank and the bankrupt and that of partners. The bank advanced the capital and the bankrupt its alleged business ability. They agreed to share in the profits of the common enterprise; the bank taking a steady and certain income secured, as it hoped, beyond the possibility of loss, and the bankrupt depending on its ability to get a larger or a smaller share of the profits; and both of the parties having equal intimate knowledge of all of the affairs of the business. Of course, the technical relation of partners did not exist, but I see no difference in essence between their business relation and that of partners, and the legal definition of the term "partnership" should not be permitted to obscure the obvious fact that such a relation did exist except in the merest technical sense. The bank has all the book accounts of the bankrupt, it has complete knowledge of the business, complete control of the credits to be given, and complete discretion in passing on the accounts and approving or disapproving them, and it has a certain fixed income out of the profits. It does not technically contribute to the firm as a partner, nor does it technically draw profits as such. While it may not be technically liable as a partner, it should not under these circumstances be permitted to gain an advantage over other creditors who have been dealing with the bankrupt at arm's length. If it cannot be called upon to contribute to the losses of the business, it should, at least, not be permitted to enjoy a preference in the distribution of the assets at hand.

The duty that it owed to the other creditors under the circumstances of this case is, in my opinion, this: That as soon as it knew, to wit, on November 1, 1910, that the bankrupt was hopelessly insolvent, it should have refused to advance it any more money and thus compel it to go into bankruptcy at that time. Its failure to do this vitiates any attempt made by it subsequently to protect itself against loss whether for past, future, or present advances, by taking possession of property of the bankrupt. I am of the opinion therefore that the assignments of accounts made by the bankrupt to the bank after November 1, 1910, and December 30, 1910, are void against the creditors for the reasons above cited.

And now, January 30, 1913, upon consideration of the petition of the First Mortgage Guarantee & Trust Company and the answer of Samuel D. Matlack, trustee in bankruptcy thereto, the cross-petition of the trustee in bankruptcy, and the answer of the said First Mortgage Guarantee & Trust Company thereto, the agreements of counsel and testimony taken, and after hearing argument of counsel, and in accordance with the foregoing findings of fact and conclusions of law, it is ordered:

1. That the assignments of book accounts made by the Cotton Manufacturers' Sales Company to the First Mortgage Guarantee & Trust Company prior to September 25, 1910, are valid assignments and that title to the same is in the said assignee.

2. That the assignments of book accounts made by the Cotton Manufacturers' Sales Company to the First Mortgage Guarantee & Trust Company between September 25, 1910, and November 1, 1910, are valid assignments as security for the amounts advanced by the said First Mortgage Guarantee & Trust Company to the said Cotton Manufacturers' Sales Company at the time of the said assignments respectively.

3. That the assignments of book accounts made by the Cotton Manufacturers' Sales Company to the First Mortgage Guarantee & Trust Company after November 1, 1910, and December 30, 1910, are void, and that title to the said accounts or the proceeds thereof is in the trustee in bankruptcy.

4. That the assignment of book accounts made by the Cotton Manufacturers' Sales Company to the First Mortgage Guarantee & Trust Company on January 6th and January 9, 1911, are void, and that title to the said accounts or proceeds thereof is in the trustee in bankruptcy.

5. That the money, to wit, the sum of $448.91, received by the First Mortgage Guarantee & Trust Company from the sale of merchandise returned by debtors of the bankrupt during February, 1911, is the property of the trustee in bankruptcy.

And it is further ordered that the said First Mortgage Guarantee & Trust

Company shall on or before February 14, 1913, file with the referee a complete and detailed statement of its account with the Cotton Manufacturers' Sales Company and with the debtors of the said Cotton Manufacturers' Sales Company whose accounts were, or purported to be, assigned to the said First Mortgage Guarantee & Trust Company, setting forth in the said account the dates and amounts of all its transactions with the said Cotton Manufacturers' Sales Company and the said debtors, more particularly the dates and amounts of all accounts assigned or purported to be assigned to it, the dates of all assignments of said accounts, the dates and amounts of all loans, advances or credits made or extended by it to the Cotton Manufacturers' Sales Company on each of the said accounts, the dates and amounts of all payments received by it on each of the said accounts, together with a full and complete transcript of the checking account of the Cotton Manufacturers' Sales Company from and after August 26, 1910.

And it is further ordered that Samuel D. Matlack, trustee in bankruptcy of the Cotton Manufacturers' Sales Company, file with the referee on or before February 14, 1913, an account of the moneys received and distributed by him under the agreement made between him and the First Mortgage Guarantee & Trust Company dated May 17, 1911.

And it is further ordered that a meeting be held before the referee on February 14, 1913, at 2 p. m., for the purpose of auditing the said accounts and entering such further orders as may be found to be just and right.

D. H. Solis-Cohen, Albert L. Moise, and John G. Johnson, all of Philadelphia, Pa., for trustee.

J. Hector McNeal and Alexander Simpson, Jr., both of Philadelphia, Pa., for First Mortgage Guarantee & Trust Co.

THOMPSON, District Judge. In the careful and painstaking report of the learned referee he has so fully stated the history of the case and so thoroughly discussed the evidence upon which his findings of fact and conclusions of law are based that a detailed reference thereto would be superfluous. The evidence sufficiently supports the referee's finding that the bankrupt was insolvent on August 26, 1910, when the original agreement between the parties was made and the statement of the bankrupt's condition as of May 1, 1910, was presented, and that its excess of liabilities over its assets continued to increase from that date to the time of the filing of the petition in bankruptcy, and his finding that the statement of the bankrupt's condition and the circumstances under which the agreement of August 26, 1910, was made were such as to put the petitioner upon inquiry as to the bankrupt's financial condition.

[1] The referee did not err, in my opinion, in finding that Mr. Nattress, the president and general manager of the bankrupt company, the agent of the petitioner in the collection of the assigned accounts, is legally chargeable with knowledge of the condition of the company during the period covered by the transactions, and that the bank is legally chargeable with its agent's knowledge of the insolvency of the company. It is argued on behalf of the petitioner that it is not bound by the knowledge of its agent because the authority of the agent was limited to the collection of the accounts and their payment to the bank. Even so, the authority of Mr. Nattress covered everything which it was necessary should be done in the transaction except the credit of the receipts upon payment of the assigned accounts and the payment of the money to the bankrupt upon its checks, and it appears that he

did transact all of the other business in connection with the assignment and collection of the accounts. To hold that the bank may appoint the principal officer of the bankrupt its agent in the transactions and thereby preclude knowledge of the transactions being obtained by the customers of the bankrupt and not be bound by the knowledge of the agent as to the bankrupt's condition of insolvency would enable parties intending to effect preferences to render nugatory the provisions of the Bankruptcy Act as to the conditions under which a preference may be set aside. The bank's consent that Mr. Nattress should act as agent for both parties prevents its escape from the general rule that notice to the agent is notice to the principal. A principal who knows that his agent is also acting as agent for the party adversely interested in a transaction with him, and yet consents that he may act as his agent, is estopped from denying the notice and knowledge which the agent has during the transaction. Pine Mountain Iron & Coal Co. v. Bailey, 94 Fed. 260, 36 C. C. A. 229.

[2] Counsel for the bank contends that the agreement of August 26, 1910, operated as an assignment in præsenti of all the accounts to come into existence in futuro, and that therefore the assignment of the accounts did not create a preference because all the collateral passed more than four months prior to the filing of the petition in bankruptcy. The referee has found that the agreement of August 26th was without consideration between the parties, that nothing passed thereby to the bank, and that no accounts passed until specific assignments were made as provided in the agreement. The final paragraph of the agreement is as follows:

"It is mutually agreed that this contract may be canceled by the second party (the bank) at any time without notice, and by the first party at any time by payment of the amount of all advances, with interest, according to the terms of the notes given in evidence thereof, and thereupon the second party agrees to reassign all unpaid accounts."

No account was assigned to the bank until September 7, 1910, and no advances were made to the bankrupt until the advance of 80 per cent. was made upon the accounts assigned at that date. Prior to September 7th the agreement could have been terminated by either party with nothing further to be done to put both parties in the same position they held prior to the execution of the agreement. Neither party could have enforced specific performance because no consideration had passed and the other party could have canceled the contract at once. There were no previous dealings between the parties by way of extension of credit and assignment of accounts as collateral, and the referee has found from the conduct of the parties, as shown by the testimony of Mr. Nattress and the officials of the bank, that each assignment was considered by the parties as a separate and independent transaction and treated as such.

It is apparent that the agreement of August 26th did not operate as an equitable assignment of the accounts, and that it is properly construed in accordance with the referee's opinion as merely providing for a future course of dealing in case specific assignments of accounts were thereafter made.

The case is clearly distinguishable from Young v. Upson (C. C.) 115 Fed. 182, and In re Schwab-Kepner Co., 203 Fed. 475, 121 C. C. A. 597, as pointed out by the learned referee, and he was clearly right in holding that by the assignments during the four months' period preferences were created except for the amounts advanced at the time of the respective assignments, and that, the bank having reasonable cause to believe that preferences were thereby created, the assignments are valid only as security for the amounts advanced at the time of the respective assignments.

As was held by the referee, the position of the bank is not helped by the collateral note. In so far as the bank attempted to secure collateral for indebtedness other than that created by the individual assignments, the collateral note cannot be said to have created any additional obligations on the part of the bankrupt, and its obligations therefore can be enforced only in so far as it is for a present fair consideration in good faith.

[3] As to the four accounts assigned before the commencement of the four months' period, the referee holds that the assignments are valid, and no exception is taken to that finding. As to the accounts assigned within the four months' period, the referee finds that those assigned between September 25, 1910, and November 1, 1910, are valid assignments as security for the amounts advanced at the time of the said assignments respectively, but that the accounts assigned between November 1, 1910, and December 30, 1910, are void under section 67e because they were made with intent on the part of the bankrupt to hinder, delay, and defraud its creditors, and that the bank cannot retain the security even for the amounts advanced at the time of the respective assignments, because it sought to profit by the fraud, and therefore is not a purchaser in good faith. As to the accounts assigned after November 1st, the referee finds that upon that date the bankrupt was hopelessly insolvent; that it knew of its insolvency; that Mr. Nattress knew of its insolvency, and that it continued to create debts it could not hope to pay; and that the bank, being bound by the knowledge of Mr. Nattress and the information it could have obtained from the books, committed a fraud upon other creditors by continuing to receive assignments of the accounts and to make advances thereon at a time when the bankrupt actually and the bank constructively knew that the bankrupt could not hope to pay its creditors. The referee bases his finding of fraud as to the bank upon the fact that the bank knowing that the bankrupt was hopelessly insolvent and unable to pay its debts nevertheless continued, through its advances and the credit its funds afforded the bankrupt, to help it create new book accounts, which were to be assigned to it as collateral security for advances to the bankrupt by which the bankrupt was to be further enabled to create new debts, which it would be unable to pay, and new book accounts for the purpose of further assigning them to the bank for further advances; and he concludes that, if the bank had refused to continue its advances, the creditors who sold to the bankrupt from and after November 1, 1910, would not have done any business with the bankrupt and incurred any loss, and that therefore the bank was responsible for the creation of the liabilities to these creditors and in the same

position legally as though it had induced them to give credit upon the faith of statements made by it directly to them, or by withholding information it was under a duty to give to other creditors.

The referee in reaching his conclusion applies to the bankrupt the rule as laid down in Gillespie v. Piles Co., 178 Fed. 886, 102 C. C. A. 120, holding that a bankrupt is guilty of a fraud upon creditors if, being in a condition of hopeless insolvency, it fails to disclose that condition and continues to obtain merchandise on credit at a time when it could not have had any intention of paying for the same or any hope of its ability to do so, and applies to the bank the principles underlying the decision in the case of Boyd v. Browne, 6 Pa. 310, where, in an action on the case for deceit, the Supreme Court of Pennsylvania held:

"The ground of action is the deceit practiced upon the injured party; and this may be either by the positive statement of a falsehood, or the suppression of material facts, which the inquiring party is entitled to know. The question always is: Did the defendant knowingly falsify, or willfully suppress the truth, with a view of giving a third party a credit to which he was not entitled?"

In the case of Gillespie v. Piles Co., certain creditors of the bankrupt obtained an order upon the trustee to return to them the proceeds of property bought by the bankrupt while insolvent and when he knew that it was impossible for him to pay for it. I quote from the syllabus by the Circuit Court of Appeals in that case:

"An insolvent buyer, who knows at the time of his purchase that his financial condition is such that it is and will be impossible for him to pay, is conclusively presumed to have bought the goods with an intention not to pay for them.

"A presumption to that effect arises from the fact that such a purchaser's affairs were in such a condition at the time of the purchase of the property that he could have had no reasonable expectation of paying for them.

"But insolvency is insufficient to establish such an intent."

It appeared that the bankrupt had entered upon the business of buying and selling hogs in the spring of 1905, with a capital of $100 and a debt of $2,000, and continued in this business until on June 26, 1908, he had accumulated property worth $20,000 and debts exceeding $100,000. During the spring and summer of 1908 he owed to vendors from $75,000 to $100,000 and had no way to pay any of them except by buying more hogs of others and using the money derived from the sales of their hogs for the purpose of paying earlier vendors. He knew this condition of things perfectly, and strove to increase his purchases and his sales in order to get money to use in this way. It appeared that, when his assets to his knowledge were not more than 20 per cent. of his liabilities for his purchases, he continued to purchase from the interveners in the bankruptcy proceeding, and the trustee was ordered to pay back the proceeds of these later sales because, as stated by the Circuit Court of Appeals:

"In this state of the case it is incredible that he intended to pay for these hogs when he bought them. He knew it was impossible for him to pay for them, and the human mind is so constituted that it cannot harbor a serious intent that the being it directs shall do that which it knows it is impossible for it to accomplish."

Upon the facts in that case it was held that the trustee had no right to retain the funds derived from the hogs sold by the interveners to the bankrupt, as the court found from the evidence that the purchases were made with an actual fraudulent intent.

In the present case the referee has found that on October 21, 1910, the excess of the bankrupt's liabilities over its assets was at least $7,-370.38; that on November 30, 1910, it was $10,990.59, and on December 31, 1910, it was $16,749.50. There is no finding as to the amount of assets and liabilities on these respective dates, but the expert accountant's statement shows on December 30, 1910, assets of $39,205.28 and liabilities of $55,954.86. I am unable to agree with the referee in his inference from these facts that from November 1 to December 30, 1910, the bankrupt was in such a condition of hopeless insolvency.that it knew when it made purchases during that period that it would be impossible for it to pay for them and that it did not intend to pay for them. The most that can be said of its condition is that it was insolvent at that time, and that its excess of liabilities was continuing to increase within those two months; but it does not follow that at any time during that period it knew that it could not recoup its losses and continue to carry on its business. To quote from the referee's report:

' "The basis of this contention (of the trustee) is fraud practiced by the bankrupt on its creditors. There is no positive direct evidence of fraud, and the trustee's contention rests upon the theory that the bankrupt, by failing to disclose its hopeless insolvency and by continuing to obtain merchandise on credit at a time when it could not have had any intention to pay for the same or any hope in its ability to do so, was guilty of such a fraud."

There is not shown in the present case so great a preponderance of liabilities over assets as, in my opinion, to warrant the presumption of bad faith, which was drawn by the court in the case of Gillespie v. Piles; nor is there any evidence to show that the loans from the bank upon the security of the accounts .receivable were obtained for any other purpose than to furnish the bankrupt with funds with which to continue to pay its creditors with the hope of making sufficient profit out of its business to enable it to extricate itself from its insolvent condition. The fact that the bank's money was used to pay some creditors to the exclusion of others and thereby to create preferences is not by any means conclusive evidence of actual fraud upon the part of the bankrupt. My conclusion is that, in the absence of evidence to the contrary, the assignments of accounts to the bank must be presumed to have been made for the purpose of obtaining funds to continue the business of the bankrupt, and that there is no presumption arising from the evidence that they were made with intent to hinder, delay, or defraud creditors. Unless the assignments were fraudulent on the part of the bankrupt, they cannot be set aside under section 67e under the authority of Coder v. Arts, 213 U. S. 223, 29 Sup. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008.

[4] The most that can be said of the assignments to the bank is that, in so far as they were not for a present fair consideration, they constituted an attempt to prefer under section 60b. Without citing at large from Coder v. Arts, I think the referee has failed to recognize

209 F.—42

the distinction therein laid down between an attempt to prefer and an attempt to defraud and the necessity of showing an actual intent on the part of the bankrupt to hinder, delay, and defraud creditors where it is attempted to void a transfer under section 67e as fraudulent. The judgment of the bankrupt's officers upon the question of continuing the business may not have been prudent, and in view of the event it would no doubt have been wiser to have discontinued the transactions with the bank and ceased doing business at a time when more could have been realized for creditors; but the fact that the bankrupt was insolvent and that its business conducted while knowing that it was insolvent proved a failure is not evidence of actual fraud upon its part. As was said in Re Maher (D. C.) 144 Fed. 503, cited with approval by the Supreme Court in Coder v. Arts:

"In a preferential transfer the fraud is constructive or technical, consisting in the infraction of that rule of equal distribution among all creditors, which it is the policy of the law to enforce when all cannot be fully paid. In a fraudulent transfer the fraud is actual, the bankrupt has secured an advantage for himself out of what in law should belong to his creditors, and not to him."

In so far as the bank advanced money at the time of the assignments without actual notice of insolvency, I do not think the trustee has sustained the burden of proof that the transactions were fraudulent and that the bank was not a purchaser in good faith and for a present fair consideration.

In Boyd v. Browne, upon which the referee relies to sustain his conclusion as to the want of good faith upon the part of the bank, it appeared that Boyd knowingly and intentionally misrepresented the credit of one Miller, whom he had induced to buy a store and stock from him upon a long term of credit, and that he not only knowingly made false representations, but knowingly suppressed facts within his knowledge when vouching for Miller's credit, and thereby enabled him to obtain from the plaintiffs in the action merchandise for which he was unable to pay.

In the present case the bank had no actual knowledge of the bankrupt's insolvent condition. It neglected to make inquiries which would have put it in possession of that knowledge, and hence, being bound by the knowledge of its agent and by the information it could have obtained from the books of the bankrupt, may properly be held to come within the provisions of section 60b as having received an unlawful preference except for the amounts actually advanced at the time of the assignment of any account within the four months' period. The knowledge of the bank as to the bankrupt's condition is an inference which the law permits to be drawn by reason of its relations with the bankrupt and its opportunities to acquire actual knowledge. Upon that inference the learned referee bases a further inference that by advancing money to the bankrupt, and thereby enabling it to obtain credit to continue business and pay some of its creditors, it was perpetrating a fraud upon other creditors because, if it had discontinued its advances at the time when the inference of knowledge is found against it, they would have learned its true condition and ceased dealing with it and thereby have forced it into bankruptcy; that its fail-

ure in this duty to the other creditors of refusing to make further loans places it in a position of having fraudulently suppressed a fact within its knowledge and therefore, having caused the losses to creditors, it did not receive the collateral for its loans in good faith. With great respect for the opinion of the learned referee, I am unable to agree with a conclusion which would put a bank loaning money to an insolvent upon collateral without notice to other creditors, but without actual knowledge of its insolvency, in the position of being liable for losses to creditors whom it or its representatives did not know, had never seen, or had never communicated with in any manner, because a result of such loans is to enable the insolvent to continue to carry on business.

I must hold that the referee was in error in his finding that the assignments made between November 1st and December 30th were void. I am unable to agree that the inference of fraud based upon an inference of knowledge is sufficient to invalidate these assignments and hold that they are valid to the same extent as those made between September 25th and November 1st.

[5] As to the proceeds of the merchandise returned by purchasers from the bankrupt to the bank after bankruptcy, the referee, for the reasons set out in his report and upon the authorities cited, was clearly right in holding that, under the law of Pennsylvania, the assignment of the accounts did not operate as an assignment of the merchandise upon which the accounts were based. Guarantee Title & Trust Co. v. First National Bank of Huntingdon, 185 Fed. 373, 107 C. C. A. 429.

The petitioner's contention is that the merchandise was intended to pass under the language of the assignment wherein the bankrupt gave to the bank "the right to stoppage in transit of the goods and merchandise covered and described therein" (that is to say, in the account). A sufficient answer to the contention is that no right of stoppage in transit was exercised, nor is the claim based upon that right.

I discover no error in the referee's rulings as to the assignment of the book accounts on January 5 and January 9, 1911.

In accordance with the foregoing views, the order of the referee is affirmed, with the exception of the third paragraph thereof, which is reversed, and it is ordered that the assignments of book accounts made by the Cotton Manufacturers' Sales Company to the First Mortgage Guarantee & Trust Company between November 1, 1910, and December 30, 1910, are valid assignments as security for the amounts advanced by the First Mortgage Guarantee & Trust Company to the said Cotton Manufacturers' Sales Company at the time of the said assignments respectively.